MASSACHUSETTS MUNICIPAL WHOLESALE ELECTRIC
COMPANY & another[1] *vs.* TOWN OF DANVERS & others.[2]

Suffolk. May 9, 1991. - August 22, 1991.

Present: ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Contract*, Construction of contract, Condition precedent, Validity, Performance and breach. *Evidence*, Extrinsic affecting writing. *Public Policy. Electric Company. Public Utilities*, Electric company. *Words*, "Default."

Where, as part of a plan for an issue of revenue bonds by the Massachusetts Municipal Wholesale Electric Company (MMWEC) to finance aquisition of an interest in a power generating facility, numerous municipalities and electrical utilities in Massachusetts and surrounding States entered into power sales agreements (PSAs) with MMWEC to secure the bonds, and where the Supreme Court of Vermont later determined the PSAs entered into by the Vermont participants were void ab initio, this court, construing the PSAs in their commercial context, concluded that the parties had not created a condition precedent that MMWEC have in effect valid PSAs for 100% of the power to be sold, with the result that, notwithstanding the Vermont decision, the Massachusetts PSAs remained valid and enforceable. [45-54]

In the context of a plan for an issue of revenue bonds by the Massachusetts Municipal Wholesale Electric Company (MMWEC) to finance acquisition of an interest in a power generating facility, whereby numerous municipalities and electrical utilities in Massachusetts and surrounding States entered into power sales agreements (PSAs) with MMWEC to secure the bonds, this court determined that nonpayment by the Vermont participants of their obligations under their PSAs, following a decision by the Supreme Court of that State that the Vermont PSAs were void ab initio, constituted a "default" within the meaning of

---

[1] Continental Bank, N.A., intervener.

[2] Nine municipal light departments: Shrewsbury Electric Light Plant, Hingham Municipal Light Plant, Sterling Municipal Electric Light Department, Georgetown Municipal Light Department, Paxton Municipal Light Department, Holden Municipal Light Department, Hudson Light and Power Department, Peabody Municipal Light Plant, and West Boylston Municipal Light Plant.

relevant language of each of the other PSAs, so as to bring into effect a provision that the remaining participants assume the rights and interests of a defaulting party. [54-62]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 24, 1989.

On transfer to the Superior Court Department the case was heard by *Hiller B. Zobel,* J., on motions for summary judgment.

The Supreme Judicial Court granted a request for direct review.

*Alan K. Posner (Alan D. Mandl & Mark W. Corner* with him) for Shrewsbury Electric Light Plant & others.

*Earle C. Cooley (Roy P. Giarrusso & Nathan S. Paven* with him) for Hudson Light and Power Department & another.

*Garrick F. Cole* for West Boylston Municipal Light Plant.

*Howard J. Roin* of Illinois *(Michele Odorizzi* of Illinois & *Kevin J. Lesinski* with him) for the intervener.

*Gerald J. Caruso (Nicholas J. Scobbo, Jr., & Ann Ryan-Small* with him) for the plaintiff.

*Francis P. McHugh, Jr.,* Assistant Town Counsel, for the town of Danvers & another, was present but did not argue.

GREANEY, J. In this case we are asked to construe power sales agreements between the Massachusetts Municipal Wholesale Electric Company (MMWEC) and utilities in Massachusetts. These agreements are part of a project created to finance the acquisition of electric power from the Seabrook nuclear power project by utilities and municipalities in Massachusetts and surrounding States, including Vermont. The Vermont Supreme Court determined that the power sales agreements between MMWEC and certain utilities in Vermont were void ab initio. The remaining municipalities and utilities in Massachusetts (defendants) now claim that this decision by the Vermont Supreme Court has rendered their agreements invalid and unenforceable. In the alternative, they argue that they are not required, under

their agreements, to step up their obligations in order to cover payments no longer being made by the Vermont utilities. A judge of the Superior Court determined that the defendants' agreements continue to be valid, and that the defendants are required to step up their obligations under their agreements. We agree with this conclusion.

The factual and procedural background of the case is as follows. MMWEC is a public instrumentality of the Commonwealth created in 1975 for the purpose of financing the purchase of electric power by utilities within and outside of Massachusetts. See St. 1975, c. 775. Its membership is made up of cities and towns in Massachusetts having municipal electric departments. MMWEC acts as a wholesaler, purchasing electricity in bulk from large generating facilities and then selling the electricity to its members, and to other utilities and municipal electric systems within and outside of Massachusetts. Under this arrangement, small utilities and municipal electric systems are able to aggregate their resources and enjoy the economic benefits associated with centralized power facilities, providing electricity at lower cost to their ratepayers.

When there is sufficient interest in an electric power facility, MMWEC creates a planning, acquisition, and finance, vehicle, called a "project," through which MMWEC acquires an ownership interest in a facility. Member municipal electric departments and other utilities enter into contracts with MMWEC to obtain shares of the project's capability by means of a document known as a power sales agreement (PSA). They thereby become participants in the project, and are required to make periodic payments for their shares of the project's capability.[3]

---

[3]A project's "capability" is defined in the PSAs as "the amounts of electric capacity and energy, if any, which the 'Project' is capable of producing at any particular time (including times when the Project is not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever)."

For any given project, MMWEC is authorized to issue long-term revenue bonds to finance the costs of constructing or acquiring ownership interests in the electric power facility. Because of the inherent uncertainty involved in projects to construct electric power facilities and acquire supplies of electric power, the cost of financing such projects is typically high. In creating MMWEC, the Legislature recognized this fact and provided for methods to insulate lenders from the uncertainty, thereby making it possible to obtain financing more economically.

The most important protection for lenders is known as the "take or pay" provision. Principal and interest on the bonds are paid solely from the payments made by participants under the PSAs. The Legislature, therefore, permits MMWEC to insert provisions in the PSAs which impose an unconditional obligation on the participants to make their payments "whether a facility is undertaken, completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of a facility." St. 1975, c. 775, §§ 5 (*t*) (ii), 6 (*a*) (ii). These take or pay provisions thus allow MMWEC to place the risk that a project will fail exclusively on the participants who enter contracts with MMWEC, guaranteeing MMWEC's stream of revenues and the bondholders' repayment regardless of the success of the project. As a result of this protection, MMWEC is able to obtain more favorable interest rates on its bonds.

In addition to the take or pay provisions, the Legislature authorized MMWEC to include in its PSAs "step-up" provisions that provide, "in the event of default by any party thereto in the performance of its obligations thereunder, for other parties to assume the obligations and succeed to the rights and interests of the defaulting party, pro rata or otherwise as may be agreed upon in the contract." *Id.* at § 6 (*a*). This provision also contributes to the security of the bonds and the reduced interest rates because it places the risk that one participant will default under the agreement — and

cease to make payments or meet other obligations — on the remaining participants rather than on the bondholders.

In 1980, MMWEC received approval from the Massachusetts Department of Public Utilities (DPU) to acquire a 6% ownership interest in two nuclear power plants under construction in the town of Seabrook, New Hampshire. MMWEC acquired its interest from the facility's owner, Public Service Company of New Hampshire, which was having difficulty financing the project. The acquisition of this interest was known as "Project 6," and it was financed by the issuance of general revenue bonds. The bonds were secured by PSAs (Project 6 PSAs), which had been entered into by MMWEC and various utilities and municipal electric power systems. The Massachusetts participants had an 80% stake in the project, and out-of-state participants took the remaining 20%. The Project 6 PSAs contain a take or pay provision, a step-up provision, and various other provisions authorized by the Legislature which were designed to insulate bondholders from the risks involved with Project 6. A general bond resolution was also executed, which was interrelated with the Project 6 PSAs.

In 1986, the Vermont Department of Public Services, an agency representing Vermont consumer interests, filed a lawsuit in the Vermont courts which challenged the legal authority of the eight municipal and cooperative utilities from Vermont that were involved in Project 6 to execute and perform their Project 6 PSAs. On September 8, 1988, the Vermont Supreme Court determined that all eight Vermont utilities lacked authority to enter into their Project 6 PSAs. That court held that those PSAs were void ab initio and that the Vermont utilities had no obligations under them. *Vermont Dept. of Pub. Serv.* v. *Massachusetts Mun. Wholesale Elec. Co.*, 151 Vt. 73 (1988), cert. denied, 493 U.S. 872 (1989).

On March 31, 1989, MMWEC issued bills to the remaining participants for monthly power costs that expressly increased each participant's payments pro rata to cover an amount equal to the 14.94% of the project capability which

was no longer being paid for by the Vermont utilities. This increase was based on the step-up provision in the Project 6 PSAs. MMWEC has included this step-up in every bill since March 31, 1989.

Following MMWEC's action, lawsuits were brought by some of the utilities and by MMWEC in the Superior Court and in the Supreme Judicial Court for Suffolk County. Eventually all the defendants joined the actions, as did Continental Bank, N.A., which acts as the trustee for the bondholders. In the lawsuits, MMWEC sought a declaration that the Project 6 PSAs with the defendants remained in effect, and that the step-up provisions in the agreements had been triggered. The utilities sought a declaration that the Vermont decision invalidated their PSAs and, in the alternative, that the step-up provisions were not applicable to the situation. A preliminary injunction was entered in the Supreme Judicial Court for Suffolk County ordering the defendants to continue to satisfy their obligations under their Project 6 PSAs.

All the actions were consolidated into the present action, which was transferred to the Superior Court for decision. In the Superior Court, all parties, except Continental Bank, moved for partial summary judgment on two issues: (1) whether the Project 6 PSAs were void due to the failure of a condition precedent that MMWEC have in effect valid PSAs for 100% of the power to be sold, and (2) whether the non-payment of MMWEC's bills by the Vermont utilities after the Vermont decision constituted a "default" under the agreements such that the step-up provision in each PSA was brought into effect. Continental Bank moved for summary judgment on all issues.

After a hearing on the pending summary judgment motions, a judge of the Superior Court decided that the defendants' Project 6 PSAs were valid, and that "the voiding ab initio by the Vermont Supreme Court effected a default within the meaning of the governing documents and thus brought into play all the results, in terms of step-up and the like, that what one might call a garden variety default of simple non-payment would have triggered." Pursuant to

Mass. R. Civ. P. 64, 365 Mass. 831 (1974), the judge reported the case (the facts being undisputed), and the correctness of his decision to the Appeals Court, and stayed all further proceedings in the Superior Court. We transferred the case to this court on our own motion.

1. *Continued validity and enforceability of the PSAs.* The defendants argue that execution and delivery by all participants of valid PSAs for 100% of project capability was a condition precedent to the existence of the PSAs and any obligations that might arise under them. The defendants claim that this alleged condition precedent was created by section 2 of each PSA, which provides: "This Agreement shall be effective upon execution and delivery of Power Sales Agreements by MMWEC and Participants whose Participants' Shares total 100.0%." According to the defendants, because the Vermont Supreme Court held that the agreements entered into by the Vermont utilities were void ab initio, the Vermont utilities never actually executed and delivered valid PSAs. Therefore, they argue, this condition precedent was not met, and none of the Project 6 PSAs ever really became effective. As a result, the defendants conclude that they have no obligations under the agreements.

A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract. See *Malden Knitting Mills* v. *United States Rubber Co.*, 301 Mass. 229, 233 (1938); *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 763 n.5 (1980). If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced. See generally 5 S. Williston, Contracts § 663 (3d ed. 1961 & Supp. 1990); Restatement (Second) of Contracts § 225 (1981).

Parties to a contract, of course, are free to create whatever conditions precedent they choose. When construing a contract, a court looks to the parties' intent to determine whether they have created a condition precedent. See *Tilo Roofing Co.* v. *Pellerin*, 331 Mass. 743, 746 (1954); *Malden Knitting Mills, supra* at 233. To ascertain intent, a court

considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances. *Wood*, *supra* at 764.

The words used by the parties in the PSAs are a significant indication of whether a condition precedent was intended. See *Louis Stoico, Inc.* v. *Colonial Dev. Corp.*, 369 Mass. 898, 902 (1976). "Emphatic words" are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement. *Commerce Ins. Co.* v. *Koch*, 25 Mass. App. Ct. 383, 385 (1988). See *A.J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, 355 Mass. 361, 365-367 (1969); *Charles, Henry & Crowley Co.* v. *Home Ins. Co.*, 349 Mass. 723, 726 (1965); *Fireman's Fund Ins. Cos.* v. *Blais*, 14 Mass. App. Ct. 254, 262 (1982).

As has been noted, section 2 of the PSAs, relied upon by the defendants, provides: "This Agreement shall be effective upon execution and delivery of Power Sales Agreements by MMWEC and Participants whose Participants' Shares total 100.0%." The emphatic words which one would expect to see if the parties intended to create a condition precedent are not present in the provision. See *Charles, Henry & Crowley Co.*, *supra* at 726 (requiring the precise words "condition precedent" or their equivalent); *Canton* v. *Thomas*, 264 Mass. 457, 458-459 (1928) (the phrase "if and when," but not "when" alone, creates a condition precedent). See also Restatement (Second) of Contracts § 226, comment a (1981) (words often used to create a condition precedent are "on condition that," "provided that," "if"). There is nothing in this provision that would support a conclusion that the contractual language itself creates a condition precedent.

However, emphatic or precise words are not absolutely necessary to create a condition. See 5 Williston, *supra* at § 671. In the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole. See *King Features Syndicate, Inc.* v. *Cape Cod Broadcasting Co.*, 317 Mass. 652, 654 (1945). In considering the contract as a whole, however, there is no clear indication that the au-

thority of each participant to enter into a PSA was meant to constitute a condition precedent to the existence of, or obligations under, all the PSAs.

The defendants refer to section 17, which makes the PSAs subject to the terms and provisions of the general bond resolution, as indicative of an intent to create a condition precedent. They then point to section 2.3E of the general bond resolution, which provides, as one of the conditions for the issuance of bonds, that "MMWEC shall have in effect valid Power Sales Agreements for the entire capacity and energy or other output of the Project for which the Bonds are being issued." In the defendants' view, section 2.3E creates a condition precedent.

This provision in the General Bond Resolution, however, concerns the issuance of bonds, and does not expressly create a condition precedent with respect to the Project 6 PSAs. In addition, section 5 (d) of each PSA states that the participants' obligation to make payments under the agreement "shall not be conditioned upon the performance by MMWEC or any other Participant under *this or any other agreement or instrument* . . ." (emphasis added). We cannot ascertain in the PSAs themselves, or in the general bond resolution, any clear intention by the parties to create the alleged condition precedent.[4]

---

[4]The law does recognize certain facts and events which are considered "implied," or "constructive," conditions to the existence or enforceability of a contract. These facts and events include legal capacity, offer, acceptance, consideration, and delivery, and "may be created by the law from the terms or nature of the contract without any manifestation of assent to their creation." 5 Williston, *supra* § 668, at 152. See, e.g., *Boston Plate & Window Glass Co.* v. *John Bowen Co.*, 335 Mass. 697, 700 (1957); *Glaz* v. *Ralston Purina Co.*, 24 Mass. App. Ct. 386, 389 (1987). They are not usually referred to as "conditions precedent." See 3A A. Corbin, Contracts § 628 (1960 & Supp. 1991.). The authority of the Vermont utilities to enter contracts with MMWEC was an implied condition to the validity of their contracts with MMWEC. See *Vermont Dep't of Pub. Serv.* v. *Massachusetts Mun. Wholesale Elec. Co.*, 151 Vt. 73 (1988), cert. denied, 493 U.S. 872 (1989). However, neither the law nor the nature of the PSAs requires us to imply that the Vermont utilities' authority was a condition precedent to the separate contracts between the other participants and MMWEC (and as will be discussed later to the validity of the step-up

The defendants have presented extrinsic evidence to support their assertions that a condition precedent exists. As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous. See *Merrimack Valley Nat'l Bank* v. *Baird*, 372 Mass. 721, 723-724 (1977). In this case, the terms of the PSAs are reasonably clear, and manifest no intent by the parties to create the alleged condition precedent.[5]

The defendants go to great lengths to argue that MMWEC and the bondholders, rather than the participants in Project 6, assumed the risk that a party's participation might be voided for lack of legal capacity, and the resulting risk that the party might cease to make payments. The manner in which parties to a contract allocate risk is a factor to consider in deciding whether a condition precedent exists. See Restatement (Second) of Contracts, *supra* § 227. Because the defendants put so much emphasis on their risk allocation argument, we think it should be separately discussed. We conclude that the manner in which risk is allocated in the PSAs supports the conclusion that valid participation by all participants was not a condition precedent to the validity of the PSAs.

The key to arrangements such as Project 6 is that participating utilities enjoy the benefits associated with joint financing in exchange for assuming certain risks involved with the project. The principal benefit to participants is that they are

---

provision). Absent a clearly expressed intention by the parties, there is no reason to do so.

[5]In any event, we do not find the defendants' evidence to be persuasive. Extrinsic evidence of a condition precedent must indicate a clear intent which is expressly stated. See, e.g., *Tilo Roofing Co.*, *supra* at 744-746 (express condition created orally at the time of agreement); *Howland* v. *Plymouth*, 319 Mass. 321, 322-324 (1946) (express condition in written offer, but not in contract). The defendants cite several drafts, letters, and affidavits which they contend support the existence of a condition precedent. Most of these documents, however, either restate what is found in the PSAs themselves or are too ambiguous to indicate any clear intent by the parties on this point. The materials relied upon by the defendants do not convince us of the existence of the alleged condition precedent.

able to obtain electric power much more conveniently and cheaply than they could if they obtained it individually. Joint financing projects enjoy higher leverage, lower capital costs, and lower financing costs. In addition, because participants do not have to obtain financing on their own, they are relieved from "compliance with earnings tests, rate covenants, and other bond indenture restrictions that would apply if they issued their own bonds." Note, *Chemical Bank* v. *Washington Pub. Power Supply Sys.*: The Questionable Use of the Ultra Vires Doctrine to Invalidate Governmental Take-or-Pay Obligations, 69 Cornell L. Rev. 1094, 1095 (1984).

The bondholders are willing to finance the project at a low rate because the participants assume a number of risks involved with the project. The most significant risk has to do with the electric power facility itself. The participants assume the risk that the facility may fail to be constructed, fail to come into operation, or fail to generate electric power. The allocation of this risk takes the form of the take or pay provision authorized by St. 1975, c. 775, § 6 (*a*) (ii), and found in section 5 (d) of the Project 6 PSAs,[6] which provides that the participants must continue to make payments for their share of energy capacity, even if they receive no electricity because the facility is not built or is not operating. In this manner, bondholders are assured that the principal and interest on their bonds will be paid regardless of the success of the underlying project.

The other significant risk involved in the project is the possibility that one or more of the participants will cease to make payments under the agreements. Because the participants' payments are the only source of revenue securing the bonds, this is a serious risk to the viability of the project as a

---

[6]Section 5 (d) provides: "The Participant shall make the payments to be made to MMWEC under this Agreement whether or not the Project or any Facility thereof is undertaken, completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of the Project or any Facility thereof for any reason whatsoever in whole or in part."

whole. In order to induce bondholders to finance joint projects such as Project 6, this risk had to be allocated away from the bondholders and placed on the participants themselves.

This risk is explicitly provided for in several provisions of the Project 6 PSAs. Individual participants are prohibited from terminating their participation except under very narrow circumstances. Section 15 (a) provides: "This Agreement shall not be subject to termination by any party *under any circumstances*, whether based upon the default of any other party under this Agreement, or any other instrument, or *otherwise*, except as specifically provided in this Agreement" (emphasis added).[7] In addition, the PSAs provide that a participant's obligation to make payments is unconditional. As already noted, section 5 (d) provides: "[P]ayments shall not be subject to any reduction, whether by offset or otherwise, and *shall not be conditioned* upon the performance by MMWEC or any other Participant under this or any other agreement or instrument . . ." (emphasis added).

Finally, the step-up provision of section 12 (d) provides that if a participant does "default" by failing to make payments, the rest of the participants' payments will be "automatically increased for the remaining term of [the] Agreement pro rata with that of the other non-defaulting Participant(s)." Thus, even if there is a "default" by one of the participants, the bondholders are assured that the principal and interest on the bonds will continue to be paid by the remaining participants.

When viewed in their entirety, the Project 6 PSAs create a comprehensive scheme of risk allocation in which the bondholders are shielded from risks to the flow of revenues under-

---

[7]Section 2 of the Project 6 PSAs provides that the agreements will terminate when "(i) all of the Facilities have been terminated as provided in Section 10 of this Agreement, (ii) the principal of and premium, if any, and interest on all of the Bonds have been paid or funds set aside for the payment or retirement thereof in accordance with the Bond Resolution and (iii) all other obligations and liabilities hereunder have been paid or provided for."

lying the bonds. It is not likely that the parties intended to isolate one specific risk to the flow of revenues — the possibility that one or more participants may be judged to lack legal capacity to enter into a PSA — and place it on MMWEC, while allocating the rest of the risks to the participants. In the absence of any clear provision to the contrary, it is reasonable to assume that the parties intended to allocate this risk to the participants as well.

The defendants argue that bond counsel's opinion letter, stating that the PSA's are "duly authorized, executed and delivered . . . and constitute valid and legally binding agreements of the parties thereto enforceable in accordance with their terms," indicates that the bondholders assumed the risk that certain agreements would be declared invalid. Because the participants were in no position to assess the validity of their coparticipants' agreements, and the bondholders were, the defendants argue, the risk was allocated to the bondholders. We are not persuaded by this argument.

The mere fact that the bondholders and MMWEC undertook their own investigation into the validity of the PSAs is not, by itself, conclusive evidence of an assumption of risk. It is not unusual for these parties to investigate an aspect of the contract as to which the other parties have assumed the risk. Indeed, the bondholders also undertook investigations into the viability and efficiency of the electric power facilities themselves, even though the risk in this area was explicitly assumed by the participants. The fact that the bondholders may have been in a better position than the participants to assess the validity of the PSAs is likewise not conclusive. The bondholders were also in a better position to determine whether one participant was likely to default, yet that risk was explicitly allocated to the participants. In the over-all scheme of risk allocation, the risk of legal incapacity of one or more of the parties was assumed by the participants, and

not by MMWEC or the bondholders.[8] The risk allocation arguments made by the defendants do not aid their case.

Our construction of the PSAs is in accordance with the principles (a) that "a construction rendering a contract valid and enforceable is to be preferred to one which makes it void or its performance impossible or meaningless," *Berger* v. *Siegel*, 329 Mass. 74, 77-78 (1952), quoting *Talbot* v. *Rednalloh Co.*, 283 Mass. 225, 230 (1933), and (b) that forfeitures are not favored unless the parties have explicitly provided for such a contingency. See *Berger, supra* at 77-78; *Finn* v. *McNeil*, 23 Mass. App. Ct. 367, 372 (1987). See also Restatement (Second) of Contracts, *supra* § 227 (1). Section 2 of the PSAs, in our opinion, was a recognition that, when most of the participants entered into Project 6, there was some uncertainty as to the number and identity of the final participants. For example, this uncertainty is manifested in an exhibit to the agreements, which set out the approximate share of project capability for each participant as of the date of the signing of the PSAs. The exhibit noted that certain participants still required approval to participate in the project and provided for adjustments of the participation shares if these participants did not get approval. In our view, the parties intended section 2 to provide that the agreements would become effective when the number, identities, and percentage participations of the participants were finalized.

---

[8]Because this risk was assumed by the defendants, they may not now rescind their agreements under the doctrines of mutual mistake or frustration of purpose. See Restatement (Second) of Contracts *supra* § 152, comment a at 386 ("the mistake must not be one as to which the party seeking relief bears the risk"); Restatement (Second) of Contracts § 265, comment a, at 335 (1981) ("The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract"). See also *Chase Precast Corp.* v. *John J. Paonessa Co.*, 409 Mass. 371 (1991); *Baetjer* v. *New England Alcohol Co.*, 319 Mass. 592, 602 (1946); *Aldrich* v. *Travelers Ins. Co.*, 317 Mass. 86, 88 (1944). In addition, because participation in Project 6 was decreased by less than 15%, allowing the project to continue to operate, there was no material effect on the agreed exchange of performances. See Restatement, *supra* § 152, comment a, at 386. Moreover, the principal purpose of the project was not frustrated. See Restatement, *supra* § 265, comment a, at 335.

Later determination by a court that one of the participants never had the authority to enter into an agreement was not meant to be an event which would cancel the entire project by rendering the obligations under the PSAs void and unenforceable.[9]

Finally, we note that the Washington Supreme Court reached the same conclusion when construing an identical provision in a similar agreement. In that case, a number of utilities and municipalities had entered into participation agreements with Washington Public Power Supply System, a joint operating agency similar to MMWEC, to finance the construction of nuclear power plants in Washington. The Washington Supreme Court declared void twenty-eight of the eighty-eight participation agreements involved in the project because it found that the participants involved in those agreements lacked the authority to enter into the agreements. *Chemical Bank* v. *Washington Pub. Power Supply Sys.*, 99 Wash. 2d 772 (1983). The remaining participants then sought to avoid their obligations under the agreements, arguing, among other things, that the authority of all participants to enter into the agreements was a condition precedent to their obligations which had not been fulfilled.

The Washington contract provision relied upon, section 3, read as follows: "This Agreement shall be effective upon execution and delivery of Participants' Agreements by Supply System and Participants whose Participants' Preliminary Shares total 1.0 [100%] or more." *Chemical Bank* v. *Washington Pub. Power Supply Sys.*, 102 Wash. 2d 874, 897 (1984), cert. denied sub nom. *Hoberman* v. *Chemical Bank*, 471 U.S. 1065, and sub nom. *Chemical Bank* v. *Public Util.*

---

[9]Because we hold that execution and delivery of valid PSAs by all of the participants was not a condition precedent to the validity of each PSA, we need not address the question whether the voiding ab initio of the Vermont utilities' agreements by the Vermont Supreme Court would constitute a failure of such a condition. In addition, we need not address the contention by Danvers that the failure of certain non-Massachusetts utilities to obtain timely approval from the Rural Electrification Administration, pursuant to the exhibit to the PSAs, was a failure of the alleged condition.

*Dist. No. 1*, 471 U.S. 1075 (1985). The Washington Supreme Court held: "Section 3 does not establish authority to enter into the contract as a condition precedent to the obligation of all. Section 3 states simply that the contract takes effect when the participants' agreements are executed. Authority to enter into the contract is not mentioned in this section and was thus not made a condition precedent to the participants' obligation. . . . The question of authority does not involve an event not certain to occur but rather a status of certain parties at the time they entered into the contract." *Id.* at 897. The court did void the remaining participants' obligations, but on other grounds which do not apply in this case. See *id.* at 897-899.

2. *The step-up provision.* The defendants argue that the step-up provision was not triggered because there was no "default" within the meaning of section 12 (d) of the Project 6 PSAs. The relevant portion of section 12 (d) reads: "Upon failure of any other Participant(s) to make any payment which failure constitutes a default under this Agreement, . . . the Participant's Share shall be automatically increased for the remaining term of this Agreement pro rata with that of the other non-defaulting Participant(s). . . ."[10] The defendants assert that the Vermont utilities were technically never parties to the Project 6 PSAs, and never had any obligations under the agreements. They argue, therefore, that the Vermont utilities could not default on obligations they never had.

The defendants' argument rests entirely on the Vermont Supreme Court's holding that the Vermont utilities' agreements were ultra vires and consequently void ab initio. *Vermont Dep't of Pub. Serv., supra* at 89-90. A contract which is void ab initio, or void from the beginning, may not be enforced. No contractual duty exists, no breach of contract is possible, and no judgment for money damages can be obtained under the contract. See 5 A. Corbin, Contracts § 993

---

[10]Section 12 (d) also provides a specified limitation on the amount by which any nondefaulting participant's share is increased.

(1960); *Bernhardt* v. *Atlantic Fin. Corp.*, 311 Mass. 183, 191 (1942). Judicial or equitable doctrines cannot breathe life into such a contract. *Vermont Dep't of Pub. Serv.*, *supra* at 91. When adjudicating rights between parties to a contract that is void ab initio, courts treat the contract as if it had never been made.

Such treatment is, of course, a legal fiction. In reality, an agreement, under which the parties performed, did exist prior to the court's decision that it is void. See 1 Corbin, *supra* § 7; 1 Williston, *supra* § 15. The legal fiction of voiding ab initio, therefore, is applied only with the view of accomplishing justice or effectuating public policy. See *Windey* v. *North Star Farmers Mut. Ins. Co.*, 231 Minn. 279, 284 (1950); *Nantista* v. *130 West 86 Apartments Corp.*, 130 Misc. 2d 635, 640 (N.Y. 1985); *Nodland* v. *Plainsmen Petroleum, Inc.*, 265 N.W.2d 252, 256 (N.D. 1978). When a court determines that a contract is unfair to the parties, violative of public policy, or contrary to the law, it has discretion to determine the rights and liabilities of the parties as matter of law. See *Town Planning & Eng'r Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 745-747 (1976). The court may decline to enforce the contract, or, in some cases, may determine that *any* obligations that could have arisen under it, at any time and in any manner, should not be enforced. In the latter case, the court may declare the contract void ab initio, dealing with it as if it had never been made.

The consequences of voiding a contract ab initio for illegality, however, must be linked to the considerations of fairness and public policy that justify the judicial remedy in the first place. "Our cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found." *Town Planning & Eng'r Assocs.*, *supra* at 746. This is particularly true when the rights of third parties, not parties to the contract, are affected by the court's remedy. See, e.g., *Barrera* v. *State Farm Mut. Auto. Ins. Co.*, 71 Cal. 2d 659, 676-677 (1969). Chief Judge Cardozo, then of the New

York Court of Appeals, has incisively spoken of the limits of the void ab initio fiction in the following manner:

> "The retroactive effect of rescission from the beginning is not, however, without limits, prescribed by policy and justice. These limits are not unknown even in controversies between parties or privies to the rescinded act . . ., but they have their typical application to the rights and duties of a stranger. For the stranger, rescission from the beginning is a watchword to be heeded when an act to be thereafter done with reference to one or other of the parties may be governed or affected by the time or quality of the severance. It does not express a rule that reaches back into the past and lays upon innocence the opprobrium of guilt. . . . 'The doctrine of relation is a fiction of law adopted by the courts solely for the purposes of justice.' . . . It becomes an instrument of injustice when used to change the quality of intervening acts or omissions by strangers to the controversy. The courts have shaped and restrained it in adaptation to its purpose." (Citations omitted.) *Sleicher* v. *Sleicher*, 251 N.Y. 366, 369-370 (1929), quoting *Gibson* v. *Chouteau*, 80 U.S. (13 Wall.) 92, 101 (1871).

The voiding ab initio of the Vermont utilities' PSAs has a binding effect on the relationship between the Vermont utilities and MMWEC. As between them, the Project 6 PSAs are void and impose no enforceable obligations. We fully accept and recognize the Vermont Supreme Court's determination in that matter. However, the parties and issues involved in this case are quite distinct. The considerations that moved the Vermont Supreme Court to declare the Vermont utilities' agreements void do not justify a mechanical extension of the legal fiction to this case. We are concerned here with interpreting contracts that involve different parties, different issues, and different policy considerations. The legal fiction of voiding ab initio does not warrant, in this situation, denial of the fact that the Vermont utilities did perform under the

agreements for a significant period of time, nor of the fact that all parties believed, during that time, that the Vermont utilities were valid participants with binding obligations. We reject, as a basis for the defendants' argument, the assertion that the Vermont utilities were never "participants" in Project 6 and never had any "obligations" under the PSAs.[11]

With that in mind, we proceed to determine whether the parties intended the step-up provision to apply when a participant's nonpayment results from its agreement being declared void ab initio. A contract must be read in a manner that will give effect to the chief design to be accomplished by it. See *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972). We again look primarily to the language of the contract in order to determine the parties' intentions. See *Louis Stoico, Inc.* v. *Colonial Dev. Corp.*, 369 Mass. 898, 902 (1976).

The step-up is triggered under section 12 (d) only when there is a failure to make a payment which constitutes a "default" under the agreement. The best indication of the parties' intentions as to the meaning of "default" is their definition of the term in the contract itself. See *Mechanics Nat'l Bank of Worcester* v. *Killeen*, 377 Mass. 100, 107 (1979). In addition, we may look to the common and accepted meaning of the term. Section 12 (a) defines "default" as follows: "Upon failure of the Participant to make any payment in full when due under this Agreement . . . MMWEC shall make demand upon the Participant, and if said failure is not cured within 20 days from the date of such demand it shall constitute a default at the expiration of such period." The defendants assert that the phrase "when due under this Agreement" expressly imposes the requirement that a missed payment must actually be *due* — i.e., there must be an enforceable obligation under the agreement to make the payment — in order for it to be a "default." They argue that,

---

[11] It is significant that the Vermont Supreme Court, while it adamantly refused to enforce any obligations between MMWEC and the Vermont utilities, did not extend the legal fiction so far as to decline to call the Vermont utilities "participants." See *Vermont Dept. of Pub. Serv.*, *supra* (referring repeatedly to the "Vermont participants").

pursuant to the Vermont decision, no payments were ever "due" under the agreement. This argument is based on a misguided application of the legal fiction of voiding ab initio, and is therefore suspect.

The substance and purposes of these contracts provide a more natural and reasonable interpretation of the contracts. See *Kerrigan* v. *Boston, supra* at 33. The phrase "when due under this Agreement," in our view, refers to the time when such payments are due. Section 5 (b) of the Project 6 PSA provides that payments from the participants to MMWEC are due and payable on the 20th of every month. The definition of "default" refers to this timing requirement and does not create an express requirement that there must be obligations which are actually enforceable before there may be a default.

The defendants point out that "default" is commonly understood to mean "failure to perform a legal or contractual duty . . ." Black's Law Dictionary 417 (6th ed. 1990). Under this commonly understood meaning, they assert, there was no default because the Vermont utilities never had a legal or contractual duty. Again, we are reluctant to interpret the terms of the defendants' agreements based on the legal fiction of the voiding ab initio of the Vermont utilities' PSAs.

In any event, the common meaning of the term "default" may be altered by express agreement of the parties or by the context of the agreement. See *Loew* v. *Minasian*, 361 Mass. 390, 390 n.1 (1972) ("We assume that 'default' in this context means merely that the note has not been paid by anyone"); *Bradbury* v. *Thomas*, 135 Cal. App. 435, 443 (1933) ("The ordinary meaning of the word 'default,' when used with respect to an obligation created by contract, is failure of performance. When used with reference to an indebtedness it means simply nonpayment"). We are satisfied that the common meaning of "default" was altered by the parties to these agreements through the context of the agreements. In addition to the definition of "default" in section 12 (a), there are other indications of the parties' intent as to the meaning of the step-up provision. As has already been discussed, the par-

ties intended to allocate the risk of one or more participants' failure to make payments, for any reason, on the participants themselves. This supports a reading of "default" as including nonpayment for any reason.

The conduct of the parties after the signing of the agreements is also indicative of their intent. See *Martino* v. *First Nat'l Bank of Boston*, 361 Mass. 325, 332 (1972). The Official Statements, issued in 1984 and 1985 in conjunction with the sale of the bonds, stated that "[t]he step-up provisions . . . provide for coverage *in the event of nonpayments* by Participants holding shares in any Project aggregating up to 20%, and MMWEC would seek to assert the step-up provision in the event of *nonpayment for any reason*" (emphasis added). In connection with the issuance of these statements, the manager of each participant executed a statement certifying that the statements were "true and correct" and "not misleading in any respect."[12] This is some indication that in entering into the contracts, and prior to this litigation, the parties understood "default" in the "step-up" provision to mean nonpayment for any reason.[13]

---

[12]Each defendant's statement certified that the Official Statement issued for the sale was "true and correct in all material respects relating to the Participant and . . . does not omit any statement or information relating to the Participant which is necessary to make the statements and information contained therein not misleading in any material respect."

[13]We reject the defendants' argument that MMWEC is prohibited by statute from imposing the step-up in this situation. St. 1975, c. 775, § 6 (*a*), provides in part: "Any such contract may also provide, in the event of default by any party thereto in the performance of its obligations thereunder, for other parties to assume the obligations and succeed to the rights and interests of the defaulting party, pro rata or otherwise as may be agreed upon in the contract." The defendants argue that because the Vermont utilities, pursuant to the Vermont decision, had no obligations, rights, or interests under their PSAs, the step-up may not be imposed pursuant to this statute. This is the same argument asserted by the defendants with respect to the PSAs themselves. Because it is based on an unjustified extension of the legal fiction of voiding ab initio, we do not view the argument favorably.

In addition, we construe the statute not as a limit on the rights of MMWEC and participating utilities to enter into contracts, but rather as a grant of power to them. The Legislature's use of the word "may" suggests a permissive and flexible grant of power. See *Beach Assocs.* v. *Fauser*, 9

The defendants refer to section 12 (e) of the Project 6 PSAs as evidence that the parties did not intend "default" to include situations where a participant does not pay because its agreement is declared void ab initio. Section 12 (e) provides:

> "If the Participant shall fail or refuse to pay any amounts due to MMWEC hereunder, the fact that other Participants have assumed the obligation to make such payments shall not relieve the Participant of its liability for such payments, and any Participants assuming such obligation, either individually or as a member of a group, shall have a right of recovery from the Participant (diminished to the extent such Participants have received value from the concomitant rights and interests)."

The defendants assert that this provision is evidence that the parties intended "default" to include only situations where there is a right of recovery against the defaulting participant. Because the Vermont decision precludes recovery against the Vermont utilities, they argue, the Vermont utilities' nonpayment is not a "default" within the meaning of the PSAs.

Section 12 (e) does not have the significance that the defendants attribute to it, as it is directed toward a particular concern. It is not an indication of the parties' intent as to the meaning of "default." Rather, section 12 (e) is a specific assurance to the participants that defaulting participants will not be relieved of their liabilities merely because their share of project capability has been assumed by the nondefaulting

---

Mass. App. Ct. 386, 389 (1980). The rest of the statute also supports construction of this grant of power as flexible and permissive. See, e.g., St. 1975, c. 775, § 23 (the act shall be liberally construed to effect its purposes); § 22 (powers conferred by the act are supplemental and additional to powers already conferred by law); § 5 (*t*) (act confers on MMWEC the power "to do all things necessary, convenient or desirable to carry out the purposes of [the] act or the powers expressly granted or necessarily implied in [the] act"). The statute does not override the parties' intentions to impose a step-up in situations like this.

participants. The stepped-up participants might receive value from assuming the defaulting participants' share of project capability. However, they still have at least a right to sue defaulting participants at law or in equity for any loss incurred as a result of the step-up.

The parties may have assumed that recovery against defaulting participants would be available, but section 12 (e) does not provide that a stepped-up participant will always recover damages from defaulting participants. Furthermore, it does not establish a right to recovery against defaulting participants as a condition to operation of the step-up provision. The step-up was valid, even though the defendants may have no absolute right to recover damages from the Vermont utilities under the Project 6 PSAs.

We conclude that the parties intended the step-up provision to come into effect where some participants have failed to make payments because their agreements were declared void ab initio. It would be contrary to the intentions of the parties to apply the legal fiction that the Vermont utilities were never participants in Project 6, never had any obligations under their agreements, and therefore could not default. All payments are due pursuant to the step-up provision.

A few final words about the whole case are in order. Project 6 has been plagued by setbacks and difficulties — in particular, the unforeseen costs and delays associated with the Seabrook nuclear plant, and the decision by the Vermont Supreme Court which voided agreements representing an important part of the project's capability. These unfortunate events have undoubtedly imposed some measure of hardship on the defendants. If they had known in 1980 what they know now, they might not have participated in Project 6.

These unanticipated hardships, however, do not alter the fact that Project 6 seemed like a good arrangement when the parties entered into it. The Project 6 PSAs were premised on a rational evaluation of the risks and benefits associated with a joint financing project such as this one. To interfere with this allocation of risks and benefits because of unforeseen

hardships, or based on the mechanical and irrational extension of a legal fiction, would introduce elements of uncertainty and arbitrariness into municipal financing arrangements. While the risks assumed by the defendants under the agreements are greater than they anticipated in this case, adherence to the intent of the parties will ultimately work to the benefit of public entities seeking financing in the future as they may be assured that their arrangements will be enforced as they intended.

A judgment is to be entered in the Superior Court declaring that the Project 6 PSAs executed by the defendants are valid and that the step-up provisions therein have been properly invoked.

*So ordered.*