Cratsley, J.
INTRODUCTION
Plaintiff, Federal Deposit Insurance Corporation (“FDIC”), as Liquidating Agent of Blackstone Bank and Trust Company (“Blackstone Bank”), brought this Motion for Summary Judgment against defendant, Boston Redevelopment Authority (“BRA”), pursuant to a Housing Creation Agreement (“HCA”). FDIC alleges that BRA owes them money as a result of the HCA and the terms of a Development Impact Project Agreement (“DIP Agreement”) between the parties.
The question presented is whether any language in the agreements triggers the right of the BRA to withhold exaction payments from the FDIC?
For the reasons discussed below, plaintiffs Motion for Summary Judgment is ALLOWED.
BACKGROUND
The summary judgment record, when considered in favor of BRA as the nonmoving party, indicates the following: In June 1988 Blackstone Bank made bridge loans totalling four-hundred forty-seven thousand, five-hundred fifteen ($447,515.00) dollars to Fountain Hill Square Limited Partnership (“Fountain Hill L.P.”), a limited partnership whose sole general partner was Taylor Properties, Inc., of Massachusetts. (Taylor Aff. par. 4.) About the same time, on June 14, 1988, the BRA entered into a HCA with Boylston Street Associates and Fountain Hill L.P.
Pursuant to the HCA, Boylston Street Associates was to make 12 annual exaction payments to the BRA, payable on August 26 of each year, totalling two-hundred seventy-five thousand five-hundred thirty and °°/ioo *139 ($275,530.00) dollars, as set forth in the DIP Agreement. (FDIC Compl. pars. 1, 3, 4.) These annual payments were for the benefit of the Fountain Hill L.P. and were assigned to Blackstone Bank. (Taylor Aff. par. 4.)
On March 15, 1991 the FDIC was appointed Liquidating Agent/Receiver of Blackstone Bank. On April 6, 1993, after acknowledging that Blackstone Bank had received the first five payment installments, the FDIC requested that the sixth, seventh, and all future installments be forwarded to the FDIC as Liquidating Agent/Receiver for Blackstone Bank. (FDIC Compl. par. 7.) The FDIC claims the sixth through ninth payment installments totalling ninety-two thousand ($92,000.00) dollars are being held by the BRA. (FDIC Compl. par. 8.)
The FDIC sent a demand letter to the BRA on August 3, 1994 demanding the BRA pay the FDIC all money the BRA presently holds representing past payments under the HCA. In addition, the FDIC demanded acknowledgement by the BRA that all future payments under the DIP Agreement would be paid over to the FDIC within twenty-one (21) days of their receipt by the BRA. (FDIC Compl. par. 9.) The BRA disputes that the $92,000.00 of DIP funds it holds are due and owing to the FDIC. (FDIC Compl. pars. 9, 10.) (BRA Answer No. 10.)
The FDIC claims the BRA has breached the HCA by withholding the final four payment installments due to the FDIC. The FDIC claims damages as a direct and proximate result of this alleged breach of contract. (FDIC Compl. pars. 15, 16.)
On February 17, 1995, this Court (Hinkle, J.) allowed in part and denied in part the FDIC’s motion that the BRA pay approximately $92,000.00 into Court to be held in escrow. The Court ordered the BRA to transmit a monthly statement to the FDIC’s counsel.
BRA argues that the FDIC’s Motion for Summary Judgment should not be granted. The BRA alleges that the FDIC is not entitled to the money because Fountain Hill L.P. failed to construct the housing units which were the subject of the bridge loans from Blackstone Bank. (Taylor Aff. par. 5.)
Fountain Hill L.P. project president, Richard Taylor, states that phase I of the Fountain Hill L.P. was, in fact, completed resulting in forty-six (46) condominium units, including low- and moderate-income units. (Taylor Aff. par. 6.)
The questions before this Court are (1) whether the FDIC’s Motion for Summary Judgment should be granted on the ground that there are no genuine issues of material fact and (2) whether there is any basis for the BRA’s allegation that a precondition exists before they are obligated to pay the money allegedly owed to the FDIC?
DISCUSSION
This court grants summary judgment where there are no genuine issues of material facts and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The nonmoving party’s failure to prove an essential element of its case “renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
Here, the issues are whether the HCA, DIP Agreement, LDA, and the Covenant agreements constitute evidence of a single contract between the parties; and whether these agreements require the completion of all low and moderate income housing emits as a condition precedent before the BRA must pay two-hundred seventy-five thousand, five-hundred thirty ($275,530.00) dollars allegedly owed to the FDIC.
1. SEVERAL WRITINGS EVIDENCE A SINGLE CONTRACT OR COMPRISE CONSTITUENT PARTS OF A SINGLE TRANSACTION
In Massachusetts, “when several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together.” F.D.I.C. v. Singh, 977 F.2d 18, 21 (1st Cir. 1992). In the Singh case a lender brought action against individual partners under a guaranty agreement executed in connection with a loan to a partnership where the FDIC was appointed as receiver and became the substitute plaintiff. The United States District Court for the District of Maine granted summary judgment in favor of the FDIC and the Guarantors appealed. The Court of Appeals held that the nonrecourse provision of a note executed by a partnership that limited the liability of any partner did not affect the liability of the partners under their separate unconditional guaranty agreements. See Chelsea Indus., Inc. v. Florence, 358 Mass. 50 (1970); see also Ucello v. Casentino, 354 Mass. 48 (1968) (holding that the parties’ intent “must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part”); Chase Commercial Corp. v. Owen, 32 Mass.App.Ct. 248 (1992) (construing a Guaranty and contemporaneous loan and security agreements as part of one transaction and reading them together despite the fact that the Guaranty did not incorporate the other documents by reference).
In this case there are four agreements that determine the outcome. The DIP Agreement was created in April 1985 between Boylston Street Associates, a joint venture between Back Bay 1984 Limited Partnership and Ingalls Real Estate, as general partners, and the BRA. The HCA was entered into as of December 19, 1986 between Boylston Street Associates, Fountain *140 Hill L.P., and the BRA. The LDA was entered into on March 30, 1988 between the BRA and Taylor Properties, Inc. and registered with the Suffolk Registry of Deeds. The Covenant is part of the LDA. Notably, the BRA is a party to all four agreements.
These agreements provide, in part, an interest in the real estate and improvements to the BRA, a right to enforce the performance bond, and an unconditional assignment of the DIP payments to the lender to induce it to advance funds, as will be shown below.
Here, applying the Singh standard, and reading all of Lhe agreements as if they comprise constituent parts of a single transaction, the following results can be reached:
The dispute in this case concerns who is entitled to the annual exaction payments to be made over a 12-year period. The obligation to pay the two-hundred sevenfy-five thousand, five-hundred thirty dollars ($275,530) was created by the DIP Agreement. (DIP Agreement at 1, 2,3,4.) The money was to be used as “a contribution to the creation of housing units for occupancy exclusively by low and moderate income residents ...” (DIP Agreement at 3.) The DIP Agreement establishes the obligation of Boylston Street Associates to pay moneys to the BRA, rather than how the BRA is to administer the money. (DIP Agreement at 1.)
The question remains of what to do if the low- and moderate-income housing units are not completed? The terms of the Covenant require the creation of 43 units of affordable housing. (The nhmber of units was changed to 41, see BRA Opposition at 2, fn. 2.) (Covenant, par. 3 at 2.) In case of foreclosure the Covenant provides that if a financial institution held a mortgage or security interest in the affordable units, the restrictive covenants as to who could occupy the units would end and the priority of repayment would be first the lender, second the mortgagor and “. . . the balance, if any, to the Authority.” (Covenant, par. 12 at 7.) Though this still does not answer the question of who is entitled to the DIP payments being made by Boylston Street Associates, the fact that the lender institution is mentioned is consistent with the idea of inducing lenders to give money to projects which they might not loan to otherwise.
The LDA, on the other hand, does contain language that speaks to the rights of the BRA in the event that Fountain Hill L.P. does not complete the project. It says that “if, prior to completion of the Improvements: . . . the Redeveloper shall fail to perform its obligations under this Agreement. . . the Authority shall in writing notify the Redeveloper of such failure . . . The Redeveloper shall . . . have ninety (90) days from the receipt by it of such written notice to cure such failure ... If the Redeveloper does not cure such failure . . . within the 90-day period . . . the Redeveloper shall... promptly . . . reconvey, the Property... to the Authority without cost to the Authority.” (LDA §802: 1, 3(a) at 35.) Further the LDA states that, “if the Redeveloper shall fail so to reconvey, the Authority may institute such actions or proceedings as it may deem advisable as well as proceedings to compel specific performance and the payment of damages, expenses and costs by the Rede-veloper [Fountain Hill L.P.].” (LDA §802: 3(a) at 36.) Consistent with the ideas expressed in the Covenant, the LDA provides that the conveyance of the land and improvements to the BRA are subject to the rights of the lenders. (LDA §802: 3(a) at 35-36, and 3(c) at 36.)
Further, in addition to the right to the return of the real estate and the right to all improvements at no cost to the BRA, the “. . . Authority shall also have the right to enforce its rights under the surety bond referred to in Section 208.” (LDA, §802:3(b) at 36.) This pertains to the requirement that prior to the real estate being conveyed to Fountain Hill L.P. it had to provide the BRA “. . . with a performance and payment surety bond or other assurance of completion running to .. . [Fountain Hill], HUD, the mortgagee, and the [BRA] Authority as their interest may appear, satisfactory in form to the Authority in connection with Phase I.” (LDA, §208 (c) at 9.)
Finally, the HCA unifies all of the other agreements between the parties. Its terms are consistent with the other agreements, namely the DIP Agreement, the Covenant, and the LDA. The DIP Agreement required Boylston Street Associates to pay the BRA $275,000.00 in 12 annual payments and the HCA has the BRA “. . . confirm [] the assignment of all future exaction payments to be made by Contributor [Boylston Street Associates] pursuant to the DIP Agreement to Developer [Fountain Hill L.P.] and to the Institutional Lender [Blackstone Bank].” (HCA, §4(b) at 7.) Notably, it does not require that future payments are to be made to Fountain Hill L.P. or Blackstone Bank depending on how many affordable units are being built or have been built; and it does not state that if construction is not completed the assignment of all future DIP payments is rescinded and reverts to the BRA (as takes place with the land and improvements thereon under the LDA).
2. EMPHATIC WORDS ARE GENERALLY CONSIDERED NECESSARY TO CREATE A CONDITION PRECEDENT THAT WILL LIMIT OR FORFEIT RIGHTS UNDER AN AGREEMENT
Massachusetts law holds that, “a condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract.” Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass. 39, 45 (1991). See Malden Knitting Mills v. United States Rubber Co., 301 Mass 229, 233 (1938); Wood v. Roy Lapidas, Inc., 10 Mass.App.Ct. 761, 763 n.5 (1980). “If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced.” Massachusetts Municipal Wholesale Electric Co. v. Danvers, supra at 45. See generally 5 S. Williston, Contracts §663 (3ded. 1961 &Supp. 1990); Restatement (Second) of Contracts §225 (1981).
*141 “When construing a contract, a court looks to the parties’ intent to determine whether they have created a condition precedent.” Massachusetts Municipal Wholesale Electric Co. v. Danvers, supra at 45. (Citations omitted.) “To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances.” Id. at 46. “The words used by the parties . . . are a significant indication of whether a condition precedent was intended.” Id. (citations omitted).
“Emphatic words” are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement." Id. (citations omitted). ‘The emphatic words which one would expect to see if the parties intended to create a condition precedent are not present in the provision.” See Charles, Henry & Crowley Co. v. Home Ins. Co., 349 Mass. 723, 726 (1965) (requiring the precise words “condition precedent” or their equivalent); Canton v. Thomas, 264 Mass. 457, 458-59 (1928) (the phrase “if and when,” but not “when” alone, creates a condition precedent).
However, “in the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole.” Massachusetts Municipal Wholesale Electric Co. v. Danvers, supra at 46.
In this case there is an absence of any strict language or “emphatic words” in any of the agreements which says payments are only due when the housing units are completed. At best, the HCA has language stating that the Affordable Units “in Phase I... will be subsidized by a portion of the DIP Exaction . . . The DIP Exaction contributions will be held in escrow by the construction lender until conveyance of the above-mentioned affordable Units is made to eligible purchasers, subject to the Covenant." (HCA, §2(e) at 6.) Looking at the first sentence of Section 2(e) it appears that only a portion of the DIP payments was assigned to the Blackstone Bank. However, there is no formula in any of the agreements to calculate the portion of the DIP payments to which Fountain Hill L.P. would be entitled.
The second sentence of Section 2(e) provides that DIP payments go directly to the construction lender. When affordable units are sold, and the construction loan is paid down, then Blackstone Bank is to convey a portion of the DIP payment to Fountain Hill L.P. Until Blackstone has been paid off for the units, it retains these payments as part of the security for its loan to Fountain Hill L.P. Thus, if units are not sold, and the bank is not paid off from the sale of these units to qualified buyers, then the bank retains the DIP payments to secure itself for the defaulted loans it has made to Fountain Hill L.P.
The contract language thus contains a valid assignment of the linkage payments and the right to retain those payments to Blackstone Bank without any condition precedent. Moreover, the low-income units did get built in phase I. (Taylor Aff. par. 6.) Additionally, most of the low-income housing units were part of Phase I of the three-phase project.
Therefore, there is no condition precedent on which the BRA can rely to permit the BRA to withhold payment of the linkage payments, totalling two-hundred seventy-five thousand, five-hundred thirty ($275,530.00) dollars, to the FDIC. The BRA cannot change midstream and say they will not pay out the DIP funds they hold. Thus, the linkage payments are due to Blackstone Bank and/or its successor, as Blackstone Bank provided the financing necessary to complete Phase I of the project. Accordingly, this Court grants the FDIC’s Motion for Summary Judgment.
ORDER
For the foregoing reasons, the FDIC’s Motion for Summary Judgment is ALLOWED.