McHugh, J.
This is an action in which J.C. Higgins Corporation, a construction contractor, seeks to recover from Fitchburg Energy Corporation certain sums to which Higgins claims it is entitled for engineering and design work Higgins performed pursuant to a letter of intent dated November 27, 1991. The action came on for trial before the undersigned, sitting without a jury. Based on the evidence introduced at the trial and the reasonable inferences I have drawn from that evidence, I make the following.
FINDINGS OF FACT
J.C. Higgins Corporation is a corporation primarily engaged in construction work. It is a large, multi-state concern and is a subsidiary of JWP, Inc., a company that, among other things, provides construction financing for industrial projects through another subsidiary.
The defendant Fitchburg Energy Corporation is a Massachusetts corporation formed in 1988 to develop and build cogeneration facilities. A cogeneration facility is, in essence, a facility that produces and sells both steam and electric power to customers.
The first project Fitchburg decided to undertake was to be located on the James River in Fitchburg itself. Fitchburg intended to build a cogeneration facility and to link it to three existing paper mills whose owners had agreed to purchase power from Fitchburg. Fitchburg intended to sell any surplus power to Massachusetts Electric Company or to some other electric utility.
In August of 1991, after deciding to build the James River facility, Fitchburg asked Stowe Engineering Corporation, a construction engineering firm known to Fitchburg’s officers, to submit a proposal for a “turnkey” project of the type Fitchburg envisioned. Stowe, although competent to perform and prepare estimates, plans and specifications, had no construction capability. Accordingly, Stowe employees solicited the participation of Higgins for construction services.
Through the fall of 1991, Fitchburg, Stowe and Higgins had a series of conversations and meetings that focused on the project and its components. Ultimately the three reached an agreement in principle on a basic concept involving a joint venture between Stowe and Higgins to provide the engineering, procurement and construction necessary for a seventeen megawatt cogeneration facility and for renovation of a steam pipeline that linked, and provided steam power to, the three mills along the James River.
While the planning work was proceeding, Fitchburg was engaged in a search for financing. To that end, it engaged a man named William O’Brien, a financing consultant. O’Brien’s function was to search out and obtain commitments from entities that would be willing to provide construction financing. Among the financing sources O’Brien consulted were construction companies who were prepared, through a financing arm, to provide construction financing if their construction services were utilized in building the project and if financing were in place to “take them out" of the project once it was up and running. In that regard, the JWP financing subsidiary made a financing proposal to Fitchburg in late September. No definitive agreement between Fitchburg and any of the financing sources was reached as the fall progressed.
As the search for financing continued, so did Higgins’s planning work. By late October, Christopher Higgins, the Higgins Construction manager, and his superior, John Karle, a Higgins executive vice president, became concerned with the amount of time and effort Higgins was spending on the project without any concrete plans for payment by Fitchburg. Higgins discussed that concern with Lee Mathieu, Fitchburg’s president.
Higgins’s concern about payment and the slow pace of efforts to obtain construction financing led Higgins to prepare and send to Mathieu a letter dated November 27, 1991. That letter contained Higgins’s proposal for engineering, procurement and construction of the seventeen-megawatt cogeneration facility Fitchburg envisioned for the sum of $ 10,860,000. Higgins’s letter stated that the project would be a “turnkey” project and said that Higgins was prepared to enter a formal contract immediately.
With the proposal, Higgins sent Mathieu a letter of intent. The letter of intent, which lies at the heart of the parties’ current disagreement, stated in material part as follows:
This letter will confirm the intentions of Fitchburg Energy Corporation (FEC) and J.C. Higgins Corporation, Turnkey Contractor, (JCH) to enter into a final contract with respect to the engineering, procurement and construction (EPC) of the 17 MW *501 cogeneration facility (the “Project”) to be located in Fitchburg, MA.
The intentions and understandings of FEC and JCH regarding the Project are as follows:
a. FEC and JCH intend to negotiate: (a) a contract for the EPE of the Project within 30 days of the signing of this letter . . .
b. FEC will release JCH to begin engineering and procurement activities in accordance with JCH’s revised proposal dated November 27, 1991 . . .
f. FEC agrees to reimburse JCH for all costs incurred on FEC’s behalf plus reasonable fees should the Project not go forward. All costs incurred from the execution of this letter of intent will be rolled forward into the final contact amount.
g. It is understood and agreed that the provisions of this letter sets (sic) forth mutual understandings with respect to certain substantive matters which shall serve as a basis for a subsequent definitive agreement. The purpose of this is intended to facilitate and expedite negotiations. It is understood that this letter is not intended to include all possible contract issues and is subject to review and approval by Project financing sources.[1]
Mathieu received the Higgins letter on or about November 28 and, with it, received the proposal to which it referred. After reviewing the letter and proposal, Mathieu called Higgins and asked for a meeting to discuss both the letter and proposal. That meeting was held on December 5, 1991 at Fitchburg’s offices. In attendance were Higgins, Karle and Tony Peters, another Higgins employee. Mathieu and Robert Davis, a Fitchburg executive vice president, were present to represent Fitchburg’s interests.
Both Mathieu and Davis were concerned that signing the letter of intent as Higgins had prepared it would, as a practical matter, bind Fitchburg to accept the financing proposal the JWP financing subsidiary had made and would give Fitchburg little freedom to deal with objections to, or concerns with, parts of the proposal other lenders might have or make. To allay the concerns expressed by Mathieu and Davis in that regard, the italicized language in ig was added to the letter of intent by hand at the meeting and was initialed by all in attendance. The letter was then signed.
I find and conclude that the letter of intent, although perhaps ambiguous perhaps in some respects, clearly embodied that manifold agreement of the parties (a) to negotiate a final contact for the project promptly, (b) to allow Higgins, and through Higgins Stowe, to proceed with engineering and procurement work while the negotiations for the completed contact were continuing, (c) to fold any expenses incurred by Higgins and Stowe into the ultimate contact price if a contractual agreement were signed, (d) to pay Higgins and Stowe for their preliminary engineering and procurement work even if no agreement for construction of the Project were signed, and (e) to make Fitchburg’s obligation to negotiate toward execution of the ultimate contact conditional upon a construction lender’s approval of the contact terms.[2]
After the letter of intent was executed, Higgins’s work continued. Between December 5, 1991 and April 15, 1992, Higgins’s employees, chiefly Chris Higgins, spent 250 hours in preparation of project documents, in meetings with Fitchburg’s representatives and in negotiations. Twenty-three dollars per hour is a fair and reasonable charge for the time spent by the Higgins employees working on the project. From all of the evidence, including evidence of the nature of Higgins’s business and its experience, I infer, and therefore find, that $7 per hour, or approximately one-third of $23 per hour, is a fair and reasonable charge for overhead and expenses associated with the work performed by Higgins’s employees. In sum, I find that $30 per hour is a fair and reasonable charge for the time spent by Higgins working on the Project.
In addition to Higgins’s work on the Project, Stowe billed Higgins $36,465 for Stowe’s work on the Project. I find that that amount was fair and reasonable for the work that Stowe performed. In sum, I find and conclude that $43,965 is a fair and reasonable charge for the work Higgins and Stowe together performed on the Project between December 5, 1991 and April 15,1992.
On January 9 and January 31, 1992, Higgins sent invoices to Fitchburg for the work Higgins was performing on the Project. The two invoices totalled $51,276.16.[3] Upon receipt of the first invoice, Mathieu called Chris Higgins and complained that the amount stated was too high. Higgins asked Mathieu if Mathieu wanted Higgins to stop work on the Project. Mathieu replied that he did not but asked that Higgins do his best to keep costs as low as was possible. Chris Higgins agreed that he would.
Fitchburg never received the financing it sought for the construction project. On or about April 15, 1992, Mathieu notified Higgins that Fitchburg wanted to revise the scope of the Project and reduce it to a more modest level. Because Higgins’s bills had not been paid, Higgins declined to proceed with a revision. Shortly thereafter, the Project was abandoned. This lawsuit then followed.
CONCLUSIONS OF LAW
“Generally, the purpose of a letter of intent is not to bind the parties; rather, it is to establish a framework for negotiating further details.” Schwanbeck v. Federal Mogul Corp., 31 Mass.App.Ct. 390, 395 (1991). The November 27, 1991 letter of agreement therefore was not a contact for construction between Fitchburg and Higgins.
The question this case poses, however, cannot be answered simply by taking some global view of the impact of a hypothetical letter of intent. The November 27, 1991 letter not only expressed the parties’ inten *502 tion to negotiate with respect to a construction contract but also embodied an agreement that Fitchburg would pay for engineering and development services performed by Higgins (and, through Higgins, Stowe) even if the Project did not go forward. See generally Restatement (Second) of Contracts §§17-18. Construing, as one must, the November 27 letter not only by reference to its terms but also by reference to the setting in which those terms were expressed, see Massachusetts Municipal Wholesale Electric Company v. Town of Danvers, 411 Mass. 39, 46 (1991), I conclude that on December 5, 1991 Higgins agreed to provide services to Fitchburg and Fitchburg agreed to pay the reasonable cost of those services whether or not funding for the Project ever was ultimately obtained. I further find and conclude that that agreement was not altered or changed by any subsequent action of the parties. Finally, I conclude, that Higgins performed the requested services, that Fitchburg failed to pay for those services and that the fair and reasonable cost of those services is, as stated, $43,965.
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter in favor of plaintiff, J.C. Higgins Corporation, against defendant, Fitchburg Energy Company, Inc., in the amount of $43,965 plus interest.

 As explained below, the italicized language was not part of the letter Higgins drafted but was added later when the parties met to discuss the letter’s terms.

 I reject in its entirety Mathieu’s testimony that the italicized language embodied the parties’ agreement that Fitch-burg would not be required to pay Higgins anything unless Fitchburg obtained construction financing. As Mathieu himself agreed, that interpretation would make Tib and f of the letter of intent entirely meaningless. More important, that is not what the italicized language said and Mathieu’s interpretation of the language is fundamentally at war with Higgins’s entire reason for desiring the letter of intent in the first place.

 The difference between the invoice totals and the amount I have found was fair and reasonable flow from two sources. First, Higgins calculated the value of its own time at $43.40 per hour and Higgins applied a “mark-up” of $3,961.16 to the Stowe charges.