Barrett, J.
On January 30, 1997, this matter was before the Court for hearing on plaintiffs’ motions for summary judgment and a permanent injunction. In support of their summary judgment motion, plaintiffs Bridgewater Corporation (“Bridgewater") and W.H. Maze Company (“Maze”) argue that they are entitled to judgment as a matter of law that defendant Massachusetts Bay Transportation Authority (“MBTA”) breached the parties’Tri-Party Agreement (“Agreement”). Specifically, plaintiffs argue that the MBTA failed to remediate oil releases on the MBTA’s property in Bridgewater, Massachusetts, in accordance with the terms of the Agreement. As to the permanent injunction, plaintiffs argue that they will suffer irreparable harm, in the form of a civil penalty, if the MBTA is not ordered to remediate the oil releases.
The MBTA opposes both motions, arguing that a genuine issue of material fact exists regarding whether a “materially different scope of work” is required to complete the remediation. If that is so, the MBTA argues, it is not in breach because a clause in the Agreement renders the Agreement null and void in its entirety. The MBTA further argues that the Agreement is voidable due to a mutual mistake of fact. The MBTA opposes the plaintiffs’ request for a permanent injunction, arguing that plaintiffs have an adequate remedy at law.
For the reasons discussed below, plaintiffs’ motions are DENIED.
BACKGROUND
The following facts, and reasonable inferences therefrom are viewed in the light most favorable to the MBTA as the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
From October 1972 until November 1992, Bridgewater was the owner of property located at 106 Hale Street in Bridgewater, Massachusetts (“the Bridgewater parcel”). Maze was a tenant, and operated a nail factory. As part of the manufacturing process, oil was used to harden the nails. Maze stored this oil in four underground storage tanks (“tanks”); these tanks contained both virgin and waste oil. These tanks were physically located on property which bounds the Bridgewater parcel on the east (“the MBTA parcel”).[2] The MBTA parcel is currently used for a freight railroad, but is being improved for use as a passenger railroad, as part of the Old Colony Railroad Project.[3]
In April 1992, the tanks were excavated and removed from the MBTA parcel by Bridgewater. When the tanks were removed, two of the tanks were observed to be leaking oil and/or hazardous materials into the soil and groundwater. The Massachusetts Department of Environmental Protection (“DEP”) was notified, and subsequently issued “Notices of Responsibility" to Bridgewater, Maze, and the EOTC.[4] These notices recited that Bridgewater, Maze and the MBTA were responsible; pursuant to G.L.c. 21E, for the oil release and were obligated to assess and remediate the resulting contamination.
In response, Bridgewater and Maze undertook containment actions, including constructing collection lagoons and a recovery well and trench, in consultation with DEP. By March 1995, however, these efforts had not resulted in complete remediation of the contamination, and the parties disputed who was responsible for remediating the soil and groundwater contamination on the MBTA properly.
In November 1994, the parties began negotiations concerning the nature and scope of the remaining remediation, as well as who was responsible for performing the remediation. At the conclusion of the negotiations, on June 15, 1995, the MBTA, Bridgewater and Maze entered into the Agreement.
The Agreement provides in pertinent part as follows.
*276 E. Each Party for itself denies any and all responsibility and/or liability alleged in any Notice of Responsibility and any and all responsibility and/or liability for any other release . . .
G. The Parties wish to provide for the permanent remediation of the alleged Release and to allocate responsibility among them for the costs thereof. . . .
2. Nature of Work to be Performed The Private Parties intend to conduct, and the MBTA agrees to cooperate with, a complete and final remediation of the alleged Release such that no further actions will be necessary in order for such alleged Release to pose no significant or otherwise unacceptable risk to health, safety, public welfare or the environment during any foreseeable period of time (collectively, the “Work”). The Parties anticipate that the Work will include, without limitation, . . . the implementation of [an Immediate Response Action plan approved by the DEP] . . . including the physical removal and proper disposal of all [contaminants],
3. Physical Removal and Disposal Work to be Conducted by MBTA Contractor In order to perform the physical removal and disposal of the Contaminant (the “Physical Work” portion of the Work) [the MBTA contractor performing the commuter rail track upgrades shall perform the Physical Work], . . . The MBTA' shall cause the MBTA Contractor to implement and perform all Physical Work under the [Immediate Response Action] plan approved by DEP in accordance with this Agreement, such . . . plan and all applicable law. . . . The MBTA shall cause the MBTA Contractor finally to complete all such Physical Work no later than that date which is four (4) months after the date DEP approves the . .. plan for the Physical Work . . . (emphasis added).
4. Cost Sharing Subject to offset as provided below on account of the fees and expenses incurred due to the [Licensed Site Professional retained by Bridgewater and Maze], [Bridgewater and Maze] collectively shall reimburse the MBTA the aggregate sum of $150,000 (subject to such offset, the “Reimbursable Amount”) within thirty (30) days after [the physical work is completed and certain other conditions are met]. The Parties agree that the Reimbursable Amount is the portion of the costs of such Work equitably allocable to the Private Parties, after taking all facts and circumstances into account. [Bridgewater and Maze] shall be solely responsible for all fees, costs and expenses of the [Licensed Site Professional, subject to offset], . . . The MBTA shall be solely responsible for paying all costs of performing the Physical Work. . . . The Reimbursable Amount has been determined by the Parties based on their mutual expectation that DES will approve an [Immediate Response Action] plan which calls materially for the excavation and soil and free phase oil disposal work contemplated by the Excavation Contingency Plan prepared by [the Licensed Site Professional], Notwithstanding any contrary provision of this Agreement, if DEP requires a materially different scope of Work from that contemplated by the [Excavation Contingency Plan[ or requires any other work in excess of the [Excavation Contingency Plan] (the “Excess Work”), then this Agreement shall be of no force or effect as to such Excess Work and the Parties shall negotiate in good faith an equitable adjustment on account of such Excess Work, provided, however, that if any post-Physical Work monitoring and reporting is required by DEP, then the MBTA shall reimburse the Private Parties promptly upon request one-half the actual, invoiced cost of such monitoring and reporting. . . . (emphasis added).
6. Miscellaneous . . . The Parties agree that neither has made or relied upon representations, written or oral, other than as set forth expressly in this Agreement . . .
On July 26, 1995, Bridgewater and Maze filed the Immediate Response Action plan (“IRA plan”) with DEP. The IRA plan stated that there were 3,000 cubic yards of contaminated soil which was to be excavated. The IRA plan was subsequently approved by DEP.[5] As approved by DEP, the IRA plan contained a condition that “[a] maximum of three-thousand (3000) cubic yards of contaminated soil maybe excavated along the [site].” By December 1995, the site had not been remediated as provided for by the Agreement.
In early 1996, MBTA consultants conducted soil tests, and determined that the IRA plan could not be accomplished, in part because the amount of contaminated soil was larger than anticipated. By letter dated May 3, 1996, the MBTA informed DEP that approximately 10,000 cubic yards of soil were contaminated, and that excavation methods would no longer be feasible. The MBTA believed that “in-situ” technology was now the most appropriate remedy.[6] The MBTA also informed DEP that it planned to upgrade the railroad tracks prior to commencing the in-situ remediation; according to the MBTA, the track upgrade would not interfere with the remediation. DEP did not respond to the MBTA letter.
In June 1996, DEP requested that the parties meet for a conference. The conference was held in August, at which time DEP provided the parties with an “Administrative Consent Order and Consented to Administrative Penalty” (“ACO”). The ACO calls on the parties to perform a number of actions not included in the 1995 IRA plan. All three parties executed the ACO. The MBTA informed Bridgewater and Maze that, in accordance with the ACO and the Agreement, the MBTA would perform the response actions set forth in the ACO, but that Bridgewater and Maze must pay their fair share of the costs the MBTA incurs as a result.[7]
Bridgewater and Maze subsequently filed against the MBTA, alleging breach of contract (Count 1), and *277 seeking a declaratory judgment (Count 2) that, by signing the DEP Consent Order, Bridgewater and Maze would not prejudice any of their rights under the Agreement.[8] Bridgewater and Maze also sought a preliminary injunction ordering the MBTA to perform the remediation as mandated by the Agreement.
DISCUSSION
A. Summary Judgment Standard
Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that the moving party is entitled to judgment as a matter of law. Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 202 (1995); Mass.R.Civ.P. 56(c). The moving party has the burden of showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Flesner v. Technical Communications Corp., 410 Mass. 805, 808-09 (1991) (citations omitted); Nashua Corp., 420 Mass. at 202.
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion. Pederson v. Time Inc., 404 Mass. 14, 17 (1989). The substantive law will identify whether a fact, in the context of the case, is material. Beatty v. NP Corp., 31 Mass.App.Ct. 606, 608 (1991). Summary judgment is particularly appropriate in cases such as the one sub judicata, where the issue revolves around interpretation of a contract, which is solely a question of law. Lumber Mutual Insur. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995), citing Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-47 (1992).
B. Plaintiffs’ Objections to Defendant’s Affidavits
At the outset, plaintiffs challenge the sufficiency of the MBTA’s affidavits in support of its opposition. The plaintiffs argue that this Court should not consider those paragraphs of Andrew Brennan’s[9] and John Wolfs[10] affidavits which are not based on personal knowledge. The challenged paragraphs each state that “upon information and belief, the MBTA entered into the Tri-Party Agreement on the basis of the representation of Bridgewater’s and Maze’s Licensed Site Professional . . . that the excavation of 3,000 cubic yards of contaminated soil would result in a permanent solution." Brennan Affidavit ¶20; Wolf Affidavit ¶14.
While the plaintiffs did not file a Motion to Strike the affidavits, they have lodged the appropriate objection to the affidavits. Pursuant to Mass.R.Civ.P. 56(e), affidavits must be based on personal knowledge. Whirty v. Lynch, 27 Mass.App.Ct. 498, 500 (1989). Since 1120 and 14 are clearly not based on personal knowledge but on “information and belief,” this Court will not consider the challenged paragraphs in ruling on plaintiffs’ motion.
However, even without these two paragraphs, plaintiffs are not entitled to judgment as a matter of law that the MBTA breached the Agreement. Moreover, genuine issues of material fact exist, rendering summary judgment inappropriate.
1. The ACO Requires a “Materially Different Scope of Work.”
The parties dispute whether the ACO requires a “materially different scope of work.” While plaintiffs argue that the dispute is immaterial, since the MBTA is in breach of the Agreement, this Court is not convinced. Interpretation of the terms of the Agreement is a question of law for this Court. Lumber Mutual Insur. Co., 419 Mass. at 707. This Court has determined that, according to its own terms, the Agreement is of no effect as to the scope of work required to remediate the property.
According to the terms of the Agreement, if
DEP requires a materially different scope of Work from that contemplated by the [Excavation Contingency Plan] or requires any other work in excess of the [Excavation Contingency Plan] (the “Excess Work”), then this Agreement shall be of no force or effect as to such Excess Work and the Parties shall negotiate in good faith an equitable adjustment on account of such Excess Work . . .
Plaintiffs assert that this language means only that the parties are required to renegotiate the amount to be reimbursed to the MBTA, not that the MBTA is released from performing the remediation efforts. However, “the scope of a party’s obligations cannot be delineated by isolating words and interpreting them as though they stood alone. Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded.” Starr v. Fordham, 420 Mass. 178, 190 (1995) (internal citations omitted). The language of the Agreement states that “this Agreement shall be of no force or effect as to such Excess Work.” Thus, as to any work that falls under the category of “Excess Work,” the Agreement does not control.
A settled principle of contract law requires that “an unambiguous agreement must be enforced according to its terms.” Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 707 (1992). The terms of the Agreement here are not ambiguous. In part, 14 provides that the plaintiffs would reimburse the MBTA $150,000 after the “Physical Work” was completed. “Physical Work” is defined by 13 as “the physical removal and disposal of the Contaminants.” Paragraph 4 also provides that “[t]he Reimbursable Amount has been determined by the Parties based on their mutual expectation that DEP will approve an IRA plan which calls materially for the excavation and soil and free phase oil disposal work contemplated by the Excavation Contingency Plan.” (Emphasis supplied.) The Excavation Contin *278 gency Plan shows that 3,000 cubic yards of soil were to be excavated.
Fairly read, the Agreement indicates that the parties intended to allocate costs based on a scope of work including only the excavation and disposal of 3,000 cubic yards of soil. “[T]he basic rule of construction [is] that we must give effect to the parties’ intentions and construe the language to give it reasonable meaning wherever possible.” Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981). “The contract [is to be construed] with reference to the situation of the parties when they made it and to the objects sought to be accomplished." Starr, 420 Mass. at 190.
Furthermore, the phrase “excess work” includes work which is either “in excess” or “materially different in scope” from that contemplated by the Excavation Contingency Plan. If “excess work” is required, then the language of the Agreement itself releases the MBTA from performing that “excess work” according to the terms of the Agreement. Here, the ACO does require a “materially different scope” of work from that which the parties contemplated. DEP has required that the parties remediate the site, leading to a “Permanent Solution.” Pursuant to 310 Code Mass. Regs. 40.0006 and 40.1003, a “Permanent Solution” is achieved once all sources of contamination are eliminated or controlled and the site no longer presents a risk. The MBTA has asserted, and plaintiffs have not rebutted, that soil excavation and disposal will no longer lead to a “Permanent Solution." Instead, “in-situ” technology must be used, whereby the soil is treated in place without excavation. Thus, the scope of work required to successfully remediate the site is “materially different.” The amount of soil to be treated has expanded threefold, from 3,000 to 10,000 cubic yards; themeth-odology has changed dramatically; and the time and expense has likewise been increased. By its own terms, the Agreement does not govern the MBTA’s performance of this “materially different scope” of work.[11] “We . . . look primarily to the language of the contract in order to determine the parties’ intentions.” Massachusetts Municipal Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 57 (1991). Here, the language of the Agreement leads this Court to the conclusion that the parties did not. in tend that the MBTA alone be responsible for performing “in-situ” remediation, but continue to be bound by an Agreement which contemplated only excavation of 3,000 yards of soil. Instead, the Agreement indicates that, in the event that circumstances are “materially" changed, the parties would renegotiate the allocation of costs and responsibilities for the remediation.[12]
2. On the Basis of this Materially Different Scope of Work the Contract May Be Voidable Due to the Parties’ Mutual Mistake of Fact.
Furthermore, even though the MBTA failed to perform the remediation by December 1995, plaintiffs are not entitled to judgment as a matter of law that the MBTA is in breach. The MBTA has put forth sufficient facts to reach a jury regarding its mutual mistake defense. “Where there has been a mistake between the parties as to the subject matter of a contract, there has been no ‘meeting of the minds,’ and the contract is voidable at the election of the party adversely affected. The mistake must be shared by both parties, and must relate to an essential element of the agreement.” LaFleur v. C.C. Pierce Co. 398 Mass. 254, 261 (1986) (internal citations omitted); The Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629, 633 (1975).
Here, the mistake clearly relates to an “essential element” of the Agreement: the remediation of the site to DEP’s approval. Whether both parties were mistaken, in that Bridgewater, Maze and the MBTA all assumed that excavation and soil disposal would effectively remediate the site, is a question of fact for the jury, precluding summary judgment. LaFleur, 398 Mass. at 262. See also, Maloney v. Sargisson, 18 Mass.App.Ct. 341, 347 (1984).
C. Plaintiffs’ Motion for a Permanent Injunction
In light of the foregoing, the issuance of a permanent injunction would be inappropriate at this time. Plaintiffs have not established that they are entitled to judgment as a matter of law, that they will suffer irreparable harm in the absence of an injunction, or that they have no adequate remedy at law.
ORDER
For the foregoing reasons, it is hereby ORDERED that plaintiffs’ Motion for Summaiy Judgment is DENIED.
It is further ORDERED that plaintiffs’ Motion for a Permanent Injunction is DENIED.

 Prior to June 1996, the MBTA parcel was owned by the Commonwealth of Massachusetts Executive Office of Transportation and Construction ("EOTC”).

 The MBTA acquired the parcel which bounded the MBTA parcel on the east in fee simple from the John Chuckran Corporation. Thus, the site at issue includes three parcels of land, one owned by Bridgewater, two by the MBTA.

 The EOTC informed DEP that the MBTA had been delegated EOTC’s responsibilities with respect to the MBTA parcel. DEP then sent a new notice to the MBTA.

 According to the applicable Massachusetts regulations, DEP had twenty-one (21) days in which to respond to the IRA plan in writing; if DEP did not do so, the IRA plan was presumptively approved. The plan was submitted on July 26, 1995. DEP did not respond by August 16, 1995, within the tweniy-one days; therefore, the IRA plan was presumptively approved. However, it appears from the summaiy judgment record that DEP requested and received additional information from the MBTA on August 14 and 16. In any event, DEP sent a letter to Bridgewater on September 6, 1995, stating that “[DEP] approves the initiation of the following Immediate Response Actions at the site with the following conditions.” The letter then set forth six conditions, concluding with the statement that “[DEP] has concerns that the extent of the groundwater and soil contamination have not been adequately defined."

 In-situ technology, as explained to the Court at oral argument, treats the contaminated soil in place without excavating it.

 At oral argument, counsel for the MBTA informed the Court that the MBTA contractor had in fact commenced the remediation efforts.

 As plaintiffs concede in their Response to Defendant’s Opposition to Motion for Summary Judgment, their request for a declaratory judgment is now moot. Plaintiffs’ Response at 11 n.6. On October 29, 1996, the Court (van Gestel, J.) allowed Plaintiffs’ Emergency Motion for Expedited Summary Judgment Schedule. The Court’s endorsement noted that the filing of certain papers was conditioned on the MBTA’s filing of a stipulation to the effect that the plaintiffs’ contract rights would not be waived or prejudiced by executing the ACO. The MBTA filed that Stipulation on November 4, 1996.

 Mr. Brennan is the MBTA’s manager of Environmental Affairs.

 Mr. Wolf is an Environmental Scientist with the firm of Sverdup Civil, Inc., which was retained by the MBTA as a design engineer for the Old Colony Railroad Project.

 By so ruling, this Court makes no statement regarding the MBTA’s rights and responsibilities under the ACO issued by the DEP. This ruling addresses only the parties rights and obligations under the Agreement signed June 15, 1995.

 For example, the parties had considered one possible change in circumstance. Paragraph 4 provides that, if DEP requires monitoring and reporting, the parties would split the cost equally.