McCann, J.
INTRODUCTION
USA Tech Auto Services, Inc. (USA) is represented by Elton Watkins. III, 306 Dartmouth Street, Boston, Massachusetts 02116. The defendant Premier Petroleum Distributors, Inc., (PPD) is represented by Michael P. Murphy, Esq., Regnante, Sterio & Osborne, LLP, Edgewater Office Park, 401 Edgewater Place, Suite 630, Wakefield, Massachusetts 01880-6210. To date PetroNet, Inc. has not filed an appearance and is not necessary for purposes of these findings. The Verified Amended Complaint is in the following eight counts: (I) breach of contract; (II) breach of contract/misrepresentation; (III) fraud; (IV) breach of a *701 supply agreement; (V) breach of lending agreement; (VI) breach of contract; (VII) breach of construction contract; and (VIII) equitable relief on mortgage foreclosure.
The answer of PPD is a general denial to each count. It raises six affirmative defenses: (1) failure to state a claim; (2) unclean hands; (3) estoppel; (4) frivolous claim under G.L.c. 231, §6F; (5) material breaches of contract; and (6) doctrine of waiver.
PPD also filed a counterclaim as a plaintiff-in-counterclaim and alleges the following three counts against the defendant in counterclaim USA: (I) breach of contract by USA and Hayek; (II) G.L.c. 93A violation by USA and Hayek; (III) conversion by USA and Hayek. An answer in counterclaim has yet to be filed by USA.

BACKGROUND

USA operated a gasoline service station at 527 North Main Street, Leominster, Massachusetts (the “premises”) on January 1, 1998. USA occupied the premises by virtue of a written lease with the then present owner Aoude Oil Company. The lease contained an option to purchase by USA for $105,000. Nassif Hayek (Hayek) is the principal of USA.
PPD is a Massachusetts corporation which sells petroleum products and conducts related business activities for wholesale distribution of gasoline to service stations. PPD supplied gasoline to USA prior to December 1998.
USA had to close the gasoline pumps at the station in December 1998 because it did not replace the old underground storage tanks as required by state regulations. At the time of the closing of the gasoline pumps, USA owed PPD in excess of $60,000 for gasoline which had previously been delivered to the station.
In 1998, as a result of negotiations, PPD agreed to loan USA funds with which to purchase property and to make required underground storage tank renovations. As part of the consideration, USA agreed to purchase gasoline from PPD for a period of ten years. There are ongoing disputes in the form of claims and counterclaims relating to the implementation of the loan that are not germane to the issue before this Court at present.
On March 1, 1999, USA and PPD entered into a product supply agreement (supply agreement) which required USA to purchase gasoline exclusively from PPD for a ten-year period. This product supply agreement was negotiated in conjunction with the loans to be made by PPD to USA.
On December 13, 1999, Robert Kline, Esq. (Kline), attorney for PPD, wrote Hayek and informed him that PPD would need to receive payment from USA for the outstanding balance of $66,757. By that same letter, PPD agreed to forebear on instituting collection litigation if USA presented a valid lease or purchase and sale agreement for the station and assigned it to PPD as additional collateral. Thereafter, USA proceeded to obtain financing through PPD and to secure the old debt, to purchase the station and to finance construction of the improvements. USA and Hayek were represented by counsel, Dennis Sargent, Esq. (Sargent), in connection with the PPD financing. On February 11, 2000, Kline informed Sargent that PPD was providing a purchase money first mortgage which would include the outstanding obligation from USA to PPD in the approximate amount of $70,000. Kline forwarded a copy of the supply agreement to Sargent on March 6, 2000. On March 15, 2000, Kline sent Sargent copies of the proposed loan documents including the promissory note and commercial mortgage. PPD obtained the financing for USA from its lender, Boston Federal Savings Bank, by loan closing on April 7, 2000.
On April 7, 2000, USA executed the following five documents: (1) promissory note in the amount of $247,095; (2) commercial mortgage security agreement and assignment of leases and rents; (3) security agreement (all assets); (4) personal guarantee of Hayek; and (5) conditional assignment of leases and rents.
The $247,095, representing the promissory note and secured by a mortgage (first mortgage), constituted $ 150,000 for USA to purchase the premises from Aoude; $70,000 for gasoline previously delivered but unpaid for; and the balance of $27,095 for excavation and cleanup of the property.
On July 20, 2000, PPD loaned an additional amount of $25,000 to USA. A separate promissory note was executed and a second commercial mortgage security agreement (second mortgage) and assignment of leases and rents was also executed.
In all material and substantial respects, the two notes and mortgages contained essentially the same provisions. Both the first and second mortgage provide in the first paragraph that the “mortgage secures all obligations as defined hereunder.” §1.5 and 1.6 of the mortgages provide:

1.5. Obligations.

The term “obligation(s),” as used in this mortgage, shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities, and amounts liquidated or unliquidated, owing by the Mortgagor to PPD at any time, of each and every kind, nature and description, whether or not contemplated on the date hereof, whether arising under this mortgage or otherwise, and whether secured or unsecured, direct or indirect (that is whether the same are due directly by the Mortgagor to PPD; or are due indirectly by the Mortgagor to PPD as endorser, guarantor, or other surety or as obligor of obligations due third persons which have been endorsed or assigned to PPD, of otherwise), absolute or contingent, due or to become due, now existing or hereafter contracted including without *702 limitation payment of the amount when due. Said term shall also include all interest and other charges chargeable to the Mortgagor or due from the Mortgagor to PPD from time to time and all costs and expenses referred to in this Mortgage.

1.6. Cross-Collateral and Future Advances.

It is the express intention of the Mortgagor that this Mortgage secure payment and performance of all of the Obligations whether now existing or hereinafter occurred by reason of FUTURE ADVANCES by PPD or otherwise, and regardless of whether such obligations are or were contemplated by the parties at the time of the granting of this Mortgage. Notice of this continuing grant of this Mortgage shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.
Each promissory note states in the first full paragraph of the second page:
Any payments received by PPD in account of this note prior to demand shall be applied first, to any cost, expenses, or charges then owed to PPD by the Borrower, second, to accrued and unpaid interest, and third, to the unpaid principal balance hereof. Any payments so received after demand shall be applied in such manner as PPD may determine.
The product supply agreement and addendum provide that payment for all gasoline and diesel shall be on a load to load basis.
In March of 2001, PPD commenced foreclosure proceedings by sale and right of redemption of USA on the second mortgage for $25,000. A foreclosure sale was scheduled for March 28, 2002.
The complaint in this action was filed March 15, 2002. Count VIII and IV and V of the verified amended complaint seek a declaratory judgment that PPD is not entitled to foreclosure on the second mortgage given by USA; and seeks a preliminary injunction restraining PPD from continuing with the foreclosure proceedings which are contemplated to be on March 28, 2002.
A short order of notice on the preliminary injunction issued on March 15, 2002 for a hearing on the preliminary injunction which was held on March 21, 2002.
On that date, this Court issued a preliminary injunction as prayed for in prayer 5, page eight of the verified complaint which was not to be construed as a decision on the merits of any issue. The Court, with the agreement of the parties, bifurcated the issue of the “dragnet” clause of the second mortgage and the intent of the parties as it relates to that clause. The Court ordered that the single bifurcated issue shall be assigned for an expedited trial date after which either party may by motion revisit the issue of the preliminary injunction. A trial on the merits on that single bifurcated issue was held on March 26, 2002.
A jury trial had been claimed by the plaintiff. None was claimed by the defendant. At the time of the hearing on the bifurcated issue, both sides waived their claim to a jury trial on the bifurcated issue.
These findings are solely on the bifurcated issue of the intent of the parties as that intent relates to a so called “dragnet clause” incorporated in the note and mortgage in question.

FINDINGS OF FACT AND RULINGS OF LAW

This Court finds that both parties were represented by counsel at the time of the closing. This Court finds that the language of the respective agreements are clear and unambiguous. This Court finds the parties contemplated at the time of the closing that PPD would be providing credit and advances to USA through the delivery of gasoline on a “load to load” basis. The parties construed that to mean one load of gasoline would be delivered to the station on credit. When the next load was delivered, that would be delivered on credit but the preceding load would be paid for.
PPD would not have arranged for the loan financing without the ten-year supply agreement which could not commence until the station opened.
In December 2001, a number of USA checks tendered for payment for the gasoline deliveries made by PPD to USA were returned for insufficient funds. In response to repeated requests and a promise to pay by Hayek, PPD delivered additional loads on credit to enable the station to continue to operate. PPD would not have delivered the gasoline which resulted in the extension of credit for at least four outstanding loads without the security provided for in the mortgages.
Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373 (2002); Citation Ins. Co. v. Gomes, 426 Mass. 379 (1998).
A contract is to be construed to give it effect as a rational business instrument and in a manner which will carry out the intention of the parties to the contract. Every word is to be given force so far as practicable and no part is to be disregarded. Shane v. Winter Hill Fed. Sav. & Loan Ass'n., 397 Mass. 479 (1986); Star v. Fordham, 420 Mass. 178 (1995).
Dragnet clauses are valid and enforceable in Massachusetts. Debral Realty, Inc. v. Marlboro Cooperative Bank, 48 Mass.App.Ct. 92 (1999). Also Everett Credit Union v. Allied Ambulance Servs., Inc., 12 Mass.App.Ct. 343 (1981). The intent of the parties is to be determined in construing a dragnet clause and must be considered in light of the circumstances and the language of the mortgage. Debral Realty, Inc. v. Marlboro Cooperative Bank, supra, Financial Acceptance Corp. v. Garvey, 6 Mass.App.Ct. 610 (1978).
PPD extended the loan to USA for a business purpose in a commercial setting. The loans derived from *703 the supply agreement with PPD. Without the supply agreement, PPD would not have made the loan.
To determine the intent of the parties, a court will look to whether the subsequent debt is of the same general kind as the debt specifically secured or whether it has a sufficiently close relationship to the original indebtedness that the consent of the debtor to securing the debt by the earlier mortgage can be inferred. Debral Realty, Inc. v. Marlboro Cooperative, supra.
The debt incurred by USA Tech for gasoline deliveries following the April and July 2000 mortgages was of the same general kind as the partial debt secured in that mortgage which included more than $70,000 in debt for gasoline deliveries previously made by PPD. Furthermore, the gasoline debt had a close relationship to the financing which was provided for the purpose of enabling PPD to obtain the ten-year gasoline supply contract and to secure the preexisting debt of USA. The debts evidenced by the mortgage and subsequent delivery of gasoline were for the same business purpose. That is, permitting USA to own and operate the station so that it could purchase future gasoline from PPD.
The Court finds and rules that given the language employed in the mortgage, the purpose of the loan, and the relationship of the loan to the supply agreement, USA, which was represented by counsel, knew or reasonably should have known that the mortgage secured future debt to PPD incurred as a result of the supply agreement. Massachusetts Municipal Wholesale Elec. Co. v. Danvers, 411 Mass. 39 (1991).
Hayek is the principal of USA. He did not testify at trial. USA’s failure to call Hayek permits an inference that his testimony would not have been helpful to the claim made by USA in this bifurcated portion of the case.
The Court finds that there is no evidence of unfairness or oppressiveness in the relationship between USA and PPD. The loans and subsequent gasoline deliveries by PPD were made for business purposes in a commercial setting. USA and PPD were each represented by counsel during all of the negotiations and execution of documents. PPD made accommodations to USA by forbearing institution of suit on the old debt and by providing additional credit through continued deliveries of gasoline in 2001 upon the promise of Hayek that USA would make payments for these gasoline deliveries. PPD relied on the mortgages as security for the promises of USA and Hayek.

INTERIM FINDINGS

This Court finds that the intent of the parties was to include future sales of gasoline over a ten-year period of the first and second mortgages to be included and part of the “dragnet” clause of each mortgage. This Court finds that USA is in default of its payments under the supply agreement; and, therefore, in default of its terms on the second mortgage.