Billings, Thomas P., J.
BACKGROUND
The plaintiff, Cummings Properties, LLC (“Cummings”) brought this action against Massachusetts General Physicians Organization (“MGPO”), after MGPO repudiated a lease for office space in a building owned by Cummings. The Complaint asserts counts for breach of contract and promissory estoppel.
MGPO maintains that it has no obligation to Cummings, reasoning that because the property was subject to an Activity and Use Limitation that Cummings failed to incorporate into the lease as required by law, the contract is against public policy and void ab initio.
The action is before the court on MGPO’s motion for summary judgment, and Cummings’s motion for a continuance pursuant to Mass.R.Civ.P. 56(f). For the reasons that follow, Cummings’s request for Rule 56(f) relief is DENIED, and MGPO’s motion for summary judgment is ALLOWED as to Count I (breach of contract) but DENIED as to Count II (promissory estop-pel).
FACTS
The summary judgment record reveals the following facts, which are either undisputed or taken in the light most favorable to Cummings, as the non-moving party.
In 1996, Cummings’s predecessor in title[1] to 10-P Commerce Way in Woburn, Massachusetts executed a Notice of Activity and Use Limitation (“AUL”) for the property, pursuant to the Department of Environmental Protection (“DEP”) regulations promulgated as part of the Massachusetts Contingency Plan (“MCP”), 310 CMR §40.000 et seq. (1999). The AUL was prepared and recorded in lieu of removing certain hazardous materials from the groundwater and soil at 10-P Commerce Way.
In 2002, after DEP audited the property under the Brownfields Act (Chapter 206 of the Acts of 1998), it required that the owner execute an amended, and more restrictive, AUL for Commerce Way. As before, the amended AUL expressly permitted use of the property for “office; industrial; commercial; retail; hotel/lodging; warehouse; healthcare; and research and development.” Now, however, “child care, day care, and residential purposes” were expressly prohibited.
The 1996 AUL contained the following Language:
Incorporation Into Deeds, Mortgages, Leases, and Instruments of Transfer. This Notice shall be incorporated into all deeds, easements, mortgages, leases, licenses, occupancy agreements or any other instrument of transfer, whereby an interest in and/or right to use the Property or portion thereof is conveyed.
The 2002 amendment is on a different form, which sets out the new use restrictions and provides, “Except as expressly amended herein, the Original AUL is hereby ratified and confirmed.”
In June 2005, MGPO contacted Cummings with a Request for Proposal to lease space to house its LADDERS program, which provides medical and therapeutic care for children with autism and related disorders. In response to the RFP, Cummings suggested that MGPO lease space at 10 Gill Street in Woburn, Massachusetts.
From late June to early August of2005, a real estate agent (Julie Gray) and an attorney (Larry Scult) representing MGPO negotiated with Cummings for space at 10 Gill Street. In the course of the discussions Cummings sent to Scult and Gray, and they reviewed, an initial draft of a lease for this address. Attached to the draft lease was a Rider, which referenced in paragraph C an AUL pertaining to three properties owned by Cummings and its affiliates. 10-P Commerce Way was one of these properties; 10 Gill Street was not.
Scult returned to Cummings a redlined copy of the draft with his changes. One of these changes was a strikeout of Paragraph C of the rider, because it had no application to the 10 Gill Street property. Scult did not examine the now deleted paragraph C any further, or make note of it for any purpose. Neither he nor Gray ever sent a draft of the lease to — or discussed paragraph C of the Rider with — their clients at MGPO.
Thereafter, Scult and the attorneys for Cummings exchanged several more drafts of the lease for 10 Gill Street, none of which contained any reference to an AUL. Cummings was simultaneously negotiating with another tenant, however, and MGPO — -which intentionally stalled the negotiations while it worked internally on the business issues associated with the expansion of the LADDERS program — lost the race. On August 17, 2005 MGPO finally told Cummings it was ready to sign, only to learn that the rival tenant had leased the space that morning.
Cummings suggested, however, that MGPO consider leasing space in other buildings that Cummings owned or managed. The first such property suggested (14 Gill Street) did not meet MGPO’s needs, so Cummings suggested 10-P Commerce Way. This, MGPO *207 decided, would do, and it let Cummings know that it would lease these premises on the same economic terms as had been negotiated for 10 Gill Street.
On August 30, 2005, therefore, Cummings proffered to Scult an initial draft of a lease and rider for 10-P Commerce Way. This draft was based on (and inferably, word-processed from) the lease that had already been negotiated for 10 Gill Street. Presumably for this reason, neither the draft Lease nor the rider for 10-P Commerce Way incorporated or otherwise referenced the AUL applicable to 10-P Commerce Way. The omission was inadvertent on Cummings’s part.
The drafts exchanged thereafter similarly omitted any reference to the AUL, as did the final executed lease for 10-P Commerce Way which the parties executed on September 16, 2005. Daniel Ginsburg, MGPO’s President and Chief Operating Officer who signed for MGPO, did not know that the property was subject to an AUL; nor does it appear that anyone else at MGPO knew this.
At some point thereafter, someone at Cummings realized that paragraph C’s reference to the AUL, intentionally deleted from the lease for 10 Gill Street (to which it did not apply), should have been re-in - serted into the lease for 10-P Commerce Way (to which it did apply). Cummings’s attorney (John Wiseman) notified Gray of the oversight. The parties were already planning to amend the lease once MGPO decided whether it would pay or amortize certain build-out costs for which it was responsible. Wiseman suggested that the AUL provision be re-inserted at that time.
Gray asked on November 8 or 9 to see the AUL language, and Wiseman e-mailed it to her. Meanwhile, Cummings continued with the process (begun in early September but not yet half-way completed), of building out the space to MGPO’s requirements. The build-out was substantially completed by December 1, the date MGPO had told Cummings it wanted to occupy the space.
Throughout November and the first half of December, the parties were in communication regarding the AUL and environmental issues, the build-out, and other issues regarding the property and the lease. No detailed recounting is required here; suffice it to say that the correspondence, both internally within MGPO and between MGPO and Cummings,[2] suggests (when viewed in the light most favorable to Cummings) the following.
There were numerous communications throughout November concerning the certificate of insurance Cummings required from MGPO.
As late as November 29, MGPO was e-mailing Cummings on such subjects as signage with the LADDERS logo, a table for the conference room, and adding a partition in the kitchen area.
On December 12, after MGPO had consulted an environmental firm (Haley & Aldrich), Gray sent Wiseman “an outline of the work that [MGPO] will require Cummings to perform at its sole cost and expense prior to [MGPO] occupying or amending the lease.” The work involved placing a geotextile barrier fabric, covered with three feet of clean fill, on all existing landscape areas.
Cummings’s communications over the next several days suggest that it found this suggestion belated, vague, poorly documented, and “preposterous”; it also expressed frustration at MGPO’s unresponsiveness to its requests for more specificity and information. Cummings also offered reassurances, e.g. that the building had been up and occupied for twenty years with no problems: that DEP itself was a prior tenant; medical offices were a permitted use; a wager that the soil at the site was cleaner than that in front of Massachusetts General Hospital itself, etc.
Finally, Cummings — while still protesting the “vague, undocumented” and “recondite” character of Gray’s requests and insisting that no further work was required — expressed its willingness to work with MGPO to “accomplish ... on a speedy basis” whatever “exterior adjustments” the LADDERS program felt it needed.
As of December 15, however, there was a consensus among the decisionmakers at MGPO that the 10-P Commerce way site was “definitely no-go.”
On December 22, Cummings notified MGPO that the space was “now fully built-out to your specifications, and is 100% ready for use.” Cummings had incurred $592,760 in direct costs for the build-out. The next day, MGPO’s Chairman and CEO wrote Cummings to say that it would not have signed the lease had it known of the AUL; that it would not occupy the premises or pay rent; and that it expected all sums paid in connection with the lease to be refunded.
Cummings’s lawsuit followed. Among other defenses, MGPO’S answer (filed on October 26, 2006) asserted that the lease agreement was void as violative of public policy, for failure to incorporate or reference the AUL in compliance with 310 CMR §§1074 and 1099.
PLAINTIFF’S MOTION FOR RELIEF UNDER MASS.R.CIV.P. 56(f)
As a preliminary matter, Cummings has moved to continue the summary judgment proceedings pursuant to Mass.R.Civ.P. 56(f). The Rule provides:
Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
*208 In order to succeed on a Rule 56(f) motion, the movant must, as a general matter, articulate by affidavit a plausible basis for the belief that discoverable material probably exists which would influence the outcome of the pending summary judgment motion, and demonstrate that it was diligent in pursuing discovery before the summary judgment initiative surfaced. First Nat’l Bank of Boston v. Slade, 379 Mass. 243, 244-45 (1979). Failure to file an affidavit detailing why further discovery is needed is ordinarily fatal to a Rule 56(f) request. Id.
Here, Cummings has failed to meet the requirements of Rule 56(f). Neither the affidavits it has filed, nor its other motion papers, identifies with any specificity the facts Cummings hopes to elicit through additional discovery, or the relevance of those facts to the issues raised by MGPO’s summary judgment motion.
Cummings has submitted numerous documents from MGPO’s evidently substantial production in response to Cummings’s Rule 34 requests. Among other subjects, these documents provide some illumination of MGPO’s internal communications and thinking during the nearly two months that it took to notify Cummings that the AUL was a deal-breaker. The documents are thus germane to Cummings’s promissory estoppel claim — on which it will survive summary judgment, see below — but they have little to do with the issue on the contract claim: whether the failure to include in the lease the required notice of the AUL makes the lease unenforceable as against public policy. See Green v. Richmond, 369 Mass. 47, 51 (1975) (“where the terms of the contract are not disputed, whether that contract is void as in contravention of public policy or otherwise illegal or in violation of law is a question of law for determination by the judge”); Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 307-08 (1991) (“One common reason for the denial of a continuance in this context is the irrelevance of further discovery to the issue being adjudicated in summary judgment”).
Finally, Cummings advances no reason why it could not have obtained already the additional discovery it now desires. Cummings filed its Complaint on September 27, 2006. MGPO served answers to Cummings’s interrogatories on December 11, 2006 and responded to Cummings’s Request for Production of Documents on December 27, 2006, producing some 3,000 pages of documents. Some requested documents were withheld, and others partially redacted, on grounds of privilege. On March 9, 2007, MGPO served its summary judgment motion. It took until September 6, 2007 for the motion to be heard. In the meantime, Cummings has filed no motion to compel, has served no further discovery requests, and has taken no depositions.
Cummings points to ajoint motion, filed on May 23, 2007 and requesting that the summary judgment hearing (then scheduled for June 19, 2007) be continued owing to a changeover in Cummings’s general counsel’s office, and that the deadline for completion of discovery be extended by three months. The motion states, “Discovery is effectively on hold pending the court’s ruling on the defendant’s motion for summary judgment.” I read this statement as a description of counsel’s approach to the case, not as an agreement to stay discovery; nor does the Court’s May 31, 2007 order allowing the motion impose or approve such a stay. Particularly where Cummings’s opposition papers, dated April 13, 2007, took the position that further discovery was needed to mount an effective opposition, to do nothing for the next four months (as in the preceding four months) was to fall short of the diligence required under Rule 56(f).[3]
Cummings’s request for a continuance under Rule 56(f) is therefore DENIED.
MGPO’S MOTION FOR SUMMARY JUDGMENT
Summary judgment is appropriate if, based on the undisputed facts and the disputed facts considered in the light most favorable to the opposing party, the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. at 422. The moving party bears the burden of affirmatively establishing that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may show the absence of a triable issue either by submitting affirmative evidence negating an essential element of the plaintiffs case or by demonstrating that proof of that element is unlikely to be forthcoming at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The standard for granting a summary judgment motion is the same as that for a directed verdict. Shimer v. Foley, Hoag & Eliot LLP, 59 Mass.App.Ct. 302, 303 n.3 (2003). This means that the motion must be denied if “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.” Dobos v. Driscoll, 404 Mass. 634, 656 (1989).
A. Count I: Breach of Contract.
The record discloses no genuine issues of fact that are material to MGPO’s public policy defense to Count I, for breach of contract.
1. Applicable Statute and Regulations.
Chapter 2IE of the General Laws sets forth a comprehensive waste site cleanup regime for Massachusetts in order to protect the public health, safety, welfare and the environment from releases and threatened releases of oil and hazardous materials. Chapter 2 IE places the initial responsibility on landowners— *209 who may seek contribution or indemnity from other responsible parties — to address a release with such “response action” as DEP deems reasonably necessary. G.L.c. 21E, §4.
In section 3(b) of Chapter 2IE, the Legislature “authorized and directed" DEP to prepare the Massachusetts Contingency Plan (“MCP”), which may be found at 310 CMR §40.000 et seq. The stated goals of the MCP include “provid[ing] for the protection of health, safety, public welfare and the environment by establishing requirements and procedures for” various activities, including “the implementation of appropriate remedial actions to abate, prevent, remedy or otherwise respond to a release or threat of release of oil and/or hazardous material.” 310 CMR 40.0002(l)(a).
The ultimate objective of a Response Action under the MCP is a “Permanent Solution” that “shall assure the attainment of ”no significant risk." 310 CMR 10.0006. “Where feasible, implementation of a Permanent Solution shall include a measure or measures designed to reduce to the extent possible the level of oil and/or hazardous materials in the environment to background.” 310 CMR 40.0190(5).
The MCP is, not surprisingly, highly detailed, and in at least one respect provides a degree of flexibility not expressly embodied in Chapter 2IE: in certain circumstances, a level of “no significant risk” may be attained, not solely by reducing contaminants to background levels or even to levels deemed safe for all human exposures, but by implementation of an AUL, limiting a property’s permissible uses such that remaining contamination will not pose a significant risk to humans. See 310 CMR 40.1012. Having an AUL in place “narrow[s] the scope of exposure assumptions used to characterize risks to human health by specifying activities and uses that are prohibited and allowed at the disposal site in the future.” 310 Code Mass. Regs.§40.1012(1).
In such cases, the MCP requires that a Notice of Activity and Use Limitation, specifying permitted and prohibited uses and other obligations of the owner, be filed in the Registry of Deeds with various attachments, including an Activity and Use Limitation Opinion by a Licensed Site Professional. See DEP Form 1075, at 310 CMR 40.1099. The Notice of AUL is signed by the landowner and the LSP. In form, it is an undertaking by the landowner to restrict use of the property in ways deemed necessary to achieve a level of no significant risk. In practice, it is a contract between DEP and the landowner, in which the use restrictions are substituted in place of a more onerous and expensive remediation.
The current version of the MCP — and that in effect when the parties signed the lease[4] — additionally provides that an AUL
shall provide notice to holders of any interest(s), in a property or a portion thereof (including without limitation, owners, lessees, tenants, mortgagees, and holders of easement rights) of the existence and location of oil and/or hazardous material at such property and the Activity and Use Limitations that have been implemented in response thereto.
310 CMR 40.1012(5)(a).
This requirement is also embedded in the form of the Notice of Activity and Use Limitation which the property owner is (and has been since at least 1995) required to sign, then file in the appropriate Registry of Deeds. 310 CMR 1074 requires, at subsection (2)(h) (formerly subsection (2)(g)) that the Notice of AUL include “an agreement to reference this Notice in all future deeds, easements, mortgages, leases, licenses, occupancy agreements, or any other instruments which convey an interest in and/or a right to use the property subject to the Activity and Use Limitation pursuant to the Response Action Outcome.”
If this weren’t clear enough, 310 CMR 40.1076 requires (and has since at least 1995) that the Notice of AUL be prepared on DEP Form 1075, found at 310 CMR 40.1099. Form 1075 includes the requisite commitment, by the signing property owner, that the AUL “shall be incorporated in full or by reference into all deeds, . . . leases, ... or any other instrument of transfer ...” This is the language, in fact, that appears in the 1996 Notice of AUL for the property at 10-P Commerce Way. There is no question, in other words, that the DEP required, and the property owner committed, that the notice would be incorporated in any lease for space at 10-P Commerce Way.
None of this should come as a surprise. Common sense suggests that use restrictions will only work if tenants (and others with interests in the property) are informed of them.
In May 1999 DEP issued its Interim Final Policy #WSC 99-300, titled “Guidance on Implementing Activity and Use Limitations” (herein, “DEP Guidance”). “The primary purpose of an AUL,” the document states, “is to help prevent unacceptable exposures to contamination left at a site.” To that end, the AUL aims “to provide property owners, holders of interests in the property and others who review property records at the Registry of deeds with notice of the presence and location of OHM [oil and hazardous materials] remaining at a disposal site and with a description of the disposal site conditions.” DEP Guidance, ¶1.3.
Of the requirement that deeds, leases, and other instruments of transfer incorporate the AUL explicitly or by reference,[5] the DEP Guidance document at ¶6.5 makes the obvious point:
This requirement is intended to ensure that people with legal rights to use the property other than the owner are aware of the existence of the AUL, the specific limitations placed on the use of the prop- *210 erfy, and conditions and obligations necessary to maintain No Significant Risk.
In short: there can be no question that both the recording and notice requirements were in effect when the lease was signed, and that they were, and are, integral to the public policy underlying the AUL regulations and the Contingency Plan in general.
2. Voidability in General.
A contract that violates either a statute or a validly enacted regulation may be — but is not necessarily— void as against public policy. Saggese v. Kelley, 445 Mass. 434, 440 (2005).
Whether a contract made in violation of a statute is void depends upon the terms of the statute and the nature of the violation. If a statute does not declare a contract made in violation of its terms to be void, and if it is not necessary to hold the contract void in order to accomplish the purposes of the statute, the inference is that the statute was intended to be directory, and not prohibitory, of the contract. On the other hand, even if a statute does not expressly provide that a contract made in violation of its terms is invalid, the contract will be deemed void if doing so is necessary to accomplish the statute’s objectives.
Baltazar Contractors, Inc. v. Town of Lunenburg, 65 Mass.App.Ct. 718, 720-21 (2006) (citations omitted).
When a court determines that a contract is unfair to the parties, violative of public policy, or contrary to the law, it has discretion to determine the rights and liabilities of the parties as a matter of law. The court may decline to enforce the contract, or, in some cases, may determine that any obligations that could have arisen under it, at any time and in any manner, should not be enforced. In the latter case, the court may declare the contract void ab initio, dealing with it as if it had never been made.
The consequences of voiding a contract ab initio for illegality, however, must be linked to the considerations of fairness and public policy that justify the judicial remedy in the first place. “Our cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found.”
Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 55 (1991) (citations omitted).
Identifying the public policy underlying legislation or administrative regulation is a question of law to be determined by the court. Green v. Richmond, 369 Mass. at 51. “ ‘Public policy’ in this context refers to a court’s conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare.” Beacon Hill Civic Ass'n v. Ristorante Toscano, 422 Mass. 318, 320 (1996).
3. Voidability in This Case.
As noted above, the MCP’s requirement that any lease of premises covered by an AUL expressly reference the AUL is explicit, and lies at the core of the policy behind AULs, the MCP, and Chapter 2IE itself. There is no dispute that the parties’ lease did not reference the AUL, and there can therefore be no genuine dispute that the requirements of the MCP, and of the AUL itself, were violated.
Cummings’s arguments for enforceability of the lease generally center on the question of whether voiding the lease is necessary to accomplish the objectives of the regulations. Specifically, it says that because MGPO’s agents Scult and Gray learned of the AUL in the course of the negotiations for the 10 Gill Street lease, and because MGPO’s intended use of the property was permitted under the AUL, there is no occasion to declare the lease void.
a. Knowledge of Scult and Gray
“When an agent acquires knowledge in the scope of her employment, the principal ... is held to have constructive knowledge of that information.” DeVaux v. American Home Assur. Co., 387 Mass. 814, 818 (1983), citing Union Old Lowell Natl. Bank, 318 Mass. 313, 323-24 (1945), and Bockser v. Dorchester Mut. Fire Ins. Co., 397 Mass. 473, 477-78 (1951). Put another way. “notice to, or knowledge of, an agent, in the course of the transaction in which he is acting for his principal, is constructive notice to, or knowledge of, the principal.” Bockser, 327 Mass. at 477-78; accord, Flynn v. Wallace, 359 Mass. 711, 718 (1971). Knowledge is imputed to the principal in order to protect innocent third parties,’ who “may properly presume the agent will perform his duty and report all facts which affect the principal’s interest.” Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 622 (1916).
“This rule does not apply,” however, “unless the agent having the knowledge has within the scope of his authority the matter with respect to which that knowledge is important.” International Totalizing Sys., Inc. v. PepsiCo, Inc., 29 Mass.App.Ct. 424, 433-34 (1990), citing Stetson Press v. Bunsen Oil Burner Corp., 285 Mass. 291, 293 (1934), and Wurm v. Allen Cadillac Co., 301 Mass. 413, 416 (1938). The reason is that although the agent has a duty — and he may reasonably be expected by third parties — to communicate material information to the principal, there is no such duty or expectation with respect to irrelevancies.
Here, the AUL was, at the time Scult and Gray acquired it, irrelevant to the transaction involving 10 Gill Street, in which they were then representing MGPO. Scult therefore red-lined the reference to it out of the draft agreement, and put it out of his mind. It is undisputed on the summary judgment record that when 10 Gill Street got away and the parties began negotiating for 10-P Commerce Way, neither Scult nor Gray made the connection with the AUL, or told MGPO of it. It should come as no surprise that busy profes *211 sionals, having learned something and promptly discarded it as unimportant to the matter at hand, should have failed to recall it, even a few weeks later, when it became important to a new, formerly uncontemplated transaction. Imputing their fleeting knowledge of the AUL to MGPO in connection with the later transaction would be inconsistent with the rationale and purpose behind this rule of agency.
b. Applicability of the AUL to MGPO’s Intended Use
Cummings’s more substantial point is that the AUL did not actually prohibit or restrict the use to which MGPO and its LADDERS program intended to put the property. MGPO argues that because LADDERS provides medical care to children, it should be considered “child care” and thus prohibited by the AUL. This seems, however, an unduly strained reading of a commonly used and well understood term. “Child care” connotes regular and extended use of the property by children, likely including periods of outdoor play, and posing greater risk of substantial and harmful contact with contaminated soils and/or groundwater than in a medical office practice, even one focused on young patients.[6] “Healthcare” was on the list of permitted uses; it remained there after the 2002 amendment; and healthcare, not childcare, is what the LADDERS program provides.
That said, the MCP is explicit that reference to the AUL is to be inserted into all leases and other instruments of transfer involving the affected property, regardless of the transferee’s intended use. That the LADDERS program would have been permitted to operate in the space does not fully address the policies underlying the notice requirement. For one thing, the AUL restricted the pool of potential sub-lessees or assignees of the lease. For another, a lessee such as LADDERS might determine that operating on a less-than-fully-remediated brownfields site was incompatible with its clinical mission, or could be otherwise “bad for business” (e.g., alarming to parents of its patients and potential patients).
Whether such concerns were well- or ill-founded, the breadth of the notice provision underscores the point that MGPO — whatever it intended to do on the property — had a legal right to be informed of the AUL and to make its own decisions, and that Cummings, as the landowner, bore the responsibility of providing that information. This is consistent with the overall “statutory and regulatory scheme,” the “clear import” of which “is that the burdens of notification, investigation, assessment, and remediation fall squarely on the owner, operator, or responsible person whose property is the course of the potential contamination . . .” Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 225 (2002).
Taken as a whole, the stated goals and purposes of the MCP and AULs bespeak a policy whereby lessees and others who would acquire interests in contaminated property are made aware of associated risks, and make their decision armed with all the information they are due. Like many of the policies imbedded in Chapter 2 IE’s remedial scheme, this one is process-oriented. It furthers the Legislature’s ultimate, substantive policy of protecting the health and welfare of the public by minimizing contact with hazardous materials to reduce risk of dangerous exposure.
The Legislature, having entrusted the drafting of the MCP and other regulations to the DEP, left no doubt as to the importance of compliance. G.L.c. 21E, §11 provides:
Any violation of this chapter, or of any regulation adopted or order issued thereunder, shall be presumed to constitute irreparable harm to the public health, safety, welfare, or the environment. Such a presumption shall be rebutted by a preponderance of the evidence . . . [A]ny person who violates any provision of this chapter, or any order or regulation issued or adopted thereunder: (a) shall be subject to a civil penalty not to exceed $50,000 for each such violation; or (b) shall be punished by a fine of not more than $50,000, or by imprisonment for not more than two years in a house of correction, or both, for each such violation.
These quite substantial penalties for noncompliance evidence “the great importance” placed by the Legislature on the public policy served by Chapter 2IE and its remedial scheme, of which the MCP is the centerpiece. See Baltazar Contractors, 65 Mass.App.Ct. at 721.
Finally, this is one of those instances in which at least one of the important objectives of the AUL regulations — ensuring that prospective lessees will be informed of the existence and terms of an AUL, before committing themselves to the lease — cannot be achieved if the contract is enforced. The lease is therefore void as against public policy, and summary judgment accordingly will enter for MGPO on Count I.
B. Count II: Promissory Estoppel
In Count II, Cummings asserts that even if the lease itself is unenforceable, Cummings should still be permitted to recover the cost of the build-out under the theory of promissory estoppel or quantum meriut.
Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission.
Bongaards v. Millen, 440 Mass. 10, 15 (2003).
MGPO counters that promissory estoppel is unavailable where the contract is void because of an illegality. Its position finds support, both in the legal fiction that such a contract is void ab initio, see Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. at 54-55, and in several cases in which the *212 appellate courts have explicitly declined to allow recovery on a promissory estoppel or quantum meruit theory once the contract has been voided. See Baltazar Contractors, 65 Mass.App.Ct. at 724 (plaintiff proceeded at its own peril when performing work under a municipal contract that did not adhere to bidding requirements); Park Drive Towing, Inc. v. Revere, 442 Mass. 80, 83 n.7 (2004) (“[A] party cannot evade the statutory limitations on a municipality’s contracting power by rendering services and subsequently seeking recovery based on alternative theories”); Potter & Mc-Arthur, Inc. v. Boston, 15 Mass.App.Ct. 454, 459-60 (1983) (“Recovery for work done in violation of limitations on the contracting powers of municipal officers also cannot be had on quantum meruit”). “In short, estoppel cannot rest on an illegal contract.” Beacon Hill Civic Ass’n, 422 Mass. at 324.
Not all of the damages Cummings claims in Count II, however, rest on the illegal contract. Cummings was within its rights in declaring the lease void once it learned of the undisclosed AUL. Taken in the light most favorable to Cummings, however, the evidence would permit the conclusion that MGPO thereafter delayed unduly in deciding to repudiate the lease, and/or in reporting that decision to Cummings; that its communications in the meantime suggested an intention to occupy the space; and that Cummings continued with the build-out in reliance on these communications and on MGPO’s failure to disavow the lease promptly upon learning of the AUL.
Where, as in this case, the provisions of a statute or regulation are premised upon a public policy that is incompatible with enforcement of a contract that violates the statute or regulation, “ ‘[t]he public policy thus declared supersedes the ordinary doctrine of estoppel, so far as that would interfere with the accomplishment of the dominant purpose’ of those provisions.” Beacon Hill Civic Ass’n, 422 Mass. at 322 (citations omitted; emphasis supplied). “Courts do not,” however, “go out of their way ... to impose a hardship upon the parties beyond that which is necessary to uphold the policy of the law." Nussenbaum v. Chambers & Chambers, Inc., 322 Mass. 419, 422 (1948).
Unlike the public contracting laws at issue in many of the estoppel cases, the requirement that the AUL be referenced in the lease was primarily for MGPO’s and its invitees’ protection; at some point, MGPO could be deemed to have waived any argument that the contract was void. The public policy underlying Chapter 2IE and the MCP will not be undermined by a requirement that the lessee, upon learning of an AUL that does not directly prohibit its proposed use of the property, act with reasonable dispatch in affirming or repudiating the lease, or else compensate the lessor for out-of-pocket costs incurred on account of the lessee’s unreasonable delay. As so delimited, Cummings’s damages stem not from the illegal contract, but from MGPO’s unreasonable delay in announcing its intentions.
When MGPO reasonably should have acted is, of course, a question of fact, as will be the question of what costs (if any) Cummings incurred thereafter. Summary judgment is therefore DENIED as to Count II.
ORDER
For the foregoing reasons, plaintiffs motion for a continuance under Mass.R.Civ.P. 56(f) is DENIED. Defendant’s motion for summary judgment is ALLOWED as to Count I and DENIED as to Count II.

This was MHP Realty, Inc. On December 18, 2002 MHP Realty, Inc., transferred the property to MHP Realty, LLC, which the same day merged into Cummings.

The documents — particularly the e-mails — are not always clear to an outsider as to the positions of the various MGPO representatives with whom Cummings was communicating. It is at least clear that Dr. Bauman (director of the LADDERS program) was unconcerned about the environmental issue and eager to move into the Wobum space, but that the move ultimately was nixed (over Bauman’s objection) by higher-ups in MGPO management.

Cummings notes also that MGPO served and filed its motion well before the original Tracking Order’s August 23, 2007 deadline for summary judgment motions to be filed and heard. It suffices to say that Rule 56 permits a defendant to move “at any time.” MGPO was not, in other words, required to wait until the last possible day allowed under the Tracking Order.

Cummings’s counsel, at the hearing, maintained that subsection (5) was added as part of the April 3, 2006 revisions to the MCP, and thus was not in effect at the time the lease was signed. With the help of the Middlesex County Law Library collection and staff, I was able to review the 5/30/97 version in hard copy. This version includes subsection (5) in its current form. Subsection (5) does not appear in the earlier (7/28/95) release, which means that it was added in 1997.

DEP Guidance ¶6.5 expressly requires that if the AUL is incorporated into a lease by reference rather than by attaching it, the reference is to specify the date, Registry, book and page.

An affidavit from the Clinical Coordinator for the LADDERS program states that the majority of LADDERS patients are between 15 months and four years old; typical appointments are a minimum of 1.5 hours; diagnosis of new patients generally takes from 1.5 to 5 hours, over one to three visits; and a newly diagnosed patient may expect two or three appointments of at least 1.5 hours each in the first year, and two such appointments per year thereafter. Children who come for speech therapy are seen weekly for a year or more, each visit being an hour or more; there are about 2,000 such patient visits per year. Those receiving both speech and occupational therapy come for weekly 2- to 2.5-hour visits, for ayear or more; there are about 1,000 of these patient visits yearly. Patients requiring acute rehabilitation come for 2 to 2.5 hours a day for one to two weeks. Finally, about 140 children are involved in research involving two to three appointments per year of three or four hours each, until they reach age 8. In short: the LADDERS hosts many, many children in a year, and sees each one significantly longer and more often than would a standard pediatric practice. The frequency and duration of these children’s visits, however, scarcely approach those of most children in daycare.